At the present term the following opinions were delivered :
Ewing, C. J.
In the year 1809, a Dutch Reformed congregation in the county of Bergen became incorporated, according to the statute of this state entitled, An act to .incorporate trustees of religious societies, by the name of “The minister, elders and deacons of the Dutch Reformed Church in the English Neighborhood.” On the same day, two tracts of land of about twenty-three acres were by lawful assurance conveyed to them in their corporate name. The minister, elders and deacons entered into possession, and they and their successors, for the time being, received and appropriated, to their just ends, the rents and profits, peaceably and without question or strife, for a number of years. Divisions have, however, arisen in the congregation; and at the institution of this action of ejectment there were, and there yet are, two sets of persons, each of whom claim to be the legal incumbents of office, and as such entitled to hold the premises and receive and apply the rents and profits. Both parties admit that the premises belong to the corporation. Both admit that the minister, elders and deacons, for the time being, of the Reformed Dutch Church in the English Neighborhood are entitled to the possession. The single question in controversy is, which set of persons are the trustees. By those out of possession, the present action of ejectment has been instituted, and it has been so moulded as distinctly and exclusively to present this enquiry. Theophilus Bolton, the tenant in actual possession, holds under a lease made to him by one set or body, who are with him the defendants. John Den, the plaintiff, claims, as appears by his declaration, under the other set or body, wrho are there named and described. And their respective leases will have validity and ought to prevail, as it shall appear on investigation that the one or the other party is, what both profess to *241 be; with, however, this difference always in view, that as the one set are in actual possession and defendants, the lessors of the plaintiff' are bound, according to the doctrines of this form of action, to shew fully and clearly that they are the minister, elders and deacons of the Dutch Reformed Ohurch in *the English Neighborhood, or rather the eiders and deacons, who when there is no minister, constitute the trustees; for failing to do this, the defendants, however defective may be their pretensions, may hold until those, in whom the right is, shall think proper to disturb them.
From this statement it may be seen that the case does not require us to consider or decide what is the effect, upon the joint property of a religious society, of the withdrawing of the whole or a portion of its members, either with or without a change of doctrine, and their union with some other religions denomination, or their formation of some new sect or some new ecclesiastical arrangement; nor whether those who thus change or withdraw, carry with them any portion of the common funds. We have too, most happily, no occasion to encounter controversial or doctrinal points, or to enquire which party is sound in doctrine or most faithfully adheres to the tenets of their church. The public acts of the parties and the avowal of their counsel on the argument at the bar, render the truth and propriety of these remarks more manifest. Both parties claim to be, of the Dutch Reformed Ohurch. The one of them, to give the more full assurance, lost circumstances might lead to any doubt, aver themselves to be, and challenge the name of, the True Reformed Dutch Ohurch. Both point to the same catechism and the same ancient synodical declaration as their rule of faith and practice. Both claim the constitution of the Reformed Dutch Ohurch in the United States of America, promulgated by their highest ecclesiastical judicatory in the year 1815, as their form of church government, by which they acknowledge they are bound, and according to which-they are willing and seek to be judged. We have theu no *242 theological controversies to investigate, no doctrinal points to discuss, no modes of faith to compare or estimate. We are simply to enquire, and, upon legal principles, who are, or speaking more exactly, -whether the lessors of. the plaintiff are, the elders and deacons of the Dutch Reformed Church in the English Neighborhood; for if they are, it is then sure, even from the lips of their adversaries, that they are entitled to judgment in this action and to the occupation of the property in dispute.
Among the early settlers of New Jersey and New York were *many emigrants from the United Provinces. They did not, like the settlers of New England, seek an 'asylum from the religious persecutions of their native land; but like them, they brought here their industry, their virtues, and especially their ardent attachment and steadfast adherence to the religious faith of their forefathers. As early as 1622, congregations were formed. In process of time these became numerous, spreading over a large portion of the then inhabited parts of- New Jersey and New York; each enjoying its religious worship and privileges; all guided by the doctrines of Heidelbergh and Dordrecht; and most of them holding that competent and safe spiritual guides and teachers were to be found only in the mother country, where all their early clergymen were either born or educated. Until the year 1771, no general system of church government was organized. In that year, the numerous flocks somewhat distracted and divided, more especially on the question whether adequate ministers could be raised here or must be sought abroad, were brought together into a common fold. A general system of church organization, similar in outline to the Reformed Dutch in Holland, and substantially the same as now exists, was then unanimously, and as we may infer from their public records, cordially adopted.
In the year 1799, when the statute of this state for the incorporation religious societies was enacted, all those who *243 professed the faith, and claimed to be members of the Reformed Dutch Church, were divided among numerous congregations, but united in a general, ecclesiastical frame of government, comprehending a consistory of each congregation, a classis having a jurisdiction over a few neighboring congregations, a particular synod embracing a few classis and a general synod, having jurisdiction over the whole. Their affairs were regulated according to the ancient constitution of their church; an authentic copy of which was published in 1793, and another, under the authority of their highest judicatory, in the year 1815.
The congregation of the English Neighborhood was early formed. It belonged for many years, as it did in the year 1799, to the classis of Hackensack. On a division of that classis in the year 1800, it was placed under the jurisdiction, and its representatives formed a part, of the classis of Bergen. In 1809, the congregation availed themselves of
the benefit intended by *the legislature,' and, as
already mentioned, became incorporated. A kind deference to the usages and customs of this church, induced the legislature to direct, in the statute for incorporation, that they should not be required to choose trustees to manage their temporal concerns like other religious associations, but that the persons whom they chose, according to the constitution ol’ their church, to govern in spiritual things, should also manage their temporal affairs. Hence, without any formal election of trustees, the ministers, elders and deacons for the time being, taking the prescribed oaths of office, were the trustees or corporators, and as such entitled to take and hold the property and direct and control the business of the corporate body.*
On the 29th day of January, 1824, a part of the congregation of the English Neighborhood, resolved to withdraw *244 and separate themselves from the classis of Bergen and the general synod of the Eeformed Dutch Ohuroh. The meeting held on that day in the church, according to public notice given on the preceding sabbath, consisted, as appears by the entry on the book of records, of the consistory, of the elders and deacons, and. about twenty-five heads of families. The chairman, one of the elders, stated to them that as the classis of Bergen had, at their late and previous meetings, tolerated false doctrines, which the general synod had also done, and passed illegal or unconstitutional orders, the consistory asked whether the meeting advised a dissolution of the connection with the classis of Bergen; and the question being put, four only voted against a dissolution. On the same day the consistory met and l-esolved, 1st, that their connection with the classis of Bergen and the general synod was dissolved. 2d, that they were and designed to remain, what they always had been, a true Eeformed Dutch Church, adhering steadfastly to the constitution of the Eeformed Dutch Church and to the word of God, upon which they believed the said constitution to be grounded. 3d, that they acknowledged themselves to be subordinate to none other than the classis and *synod of the true Eeformed Dutch Church, whose reasons for separating from the general synod as contained in this printed pamphlet, they approved and adopted.
On the 20th February, 1824, after certain proceedings of the classis of Bergen on the 17th and 18th of'’that month, which will be hereafter more fully adverted to, a document was drawn up and signed by a number of the members in full communion, whereby they avow their belief of the pure doctrines of the Eeformed Dutch Church as contained in her standards; and protest against the proceedings of the classis of Bergen; and declare themselves not subject to that body. And on the same day, the consistory drew up and signed a protest against all the proceedings that might be attempted against them in the congregation, by any one *245 acting under the authority of the classis of Bergen, “ because, say they, we do not acknowledge the authority of the classis of Bergen nor of the general synod, inasmuch as those bodies have departed from the doctrine and standards of the Reformed Dutch Church, and because this consistory and church of the English Neighborhood, are, and in fact were, before the late meeting of the classis of Bergen, as will appear by our acts, subject to none other than to the classis and synod of the true Reformed Dutch Church.”
I have said a part of the congregation withdrew and separated. The number of subscribers to this document is forty-nine, nineteen males and thirty females. These were, of the members in full communion. I do not find, from the evidence before us, whether any others of the congregation, of those who were not in communion, joined with them; It seems reasonable to suppose that others did so, but I have overlooked the direct evidence of it, if there be any. Nor am I able to gain, from the evidence, with precision, a comparative view of the number of those who seceded and those who remained. The memorial or complaint against the consistory, presented to the classis, purported to have been signed by sixty-two “ members of the church and congregation.” In the minutes of the general synod, statistical reports are published. In the year 1824, there is none from the English Neighborhood, for an obvious reason. In 1819, the congregation consisted of one hundred and forty-two *families and eight hundred and twenty persons; of these, eighty were in communion. Until 1826, there is no enumeration. In that year the minutes state one hundred and forty families, six hundred and fifty persons in the congregation, and fifty-three in communion. And herein, I presume, is included those only who remained, and not those who had withdrawn. Among the latter were all the elders and all the deacons then in office in this congregation. The minister, elders and deacons, for the time being, the persons *246 who filled these spiritual offices, and who, therefore, according to the statute were the corporators or trustees for the time being, had declared themselves no longer to belong to the classis or the synod.
The residue of the members of this congregation, who did not subscribe the above mentioned document or then or afterwards unite in the secession, remained, as must be and is conceded by all, members of the'congregation of the English Neighborhood, of the classis of Bergen, of the particular synod, of the general synod, and of the Reformed Dutch Church; deprived it may’be, for the time, of their spiritual congregational leaders, of incumbents in their consistory, but not in the faintest degree deprived of their standing in the church or having their rights taken away, impaired or diminished.
In the act of withdrawing, they who sign it declare, that they retain and adhere to the faith and doctrines of the Reformed Dutch Church as contained in its standards. We are to take this declaration to be true. Did they, therefore, remain members of the Reformed Dutch Church? Simply holding the same faith, without submitting to the government and discipline of a church, cannot make .or keep a man a member of that church. If a person without religious faith,-or having the faith of one sect, becomes a convert to the spiritual views of another denomination, he does not thereby become, ipso facto, a member 6f the latter. ’ The members of the Reformed Dutch Church in the United States are not members of the Presbyterian Church, nor the Presbyterians, members of the Reformed Dutch Church, although their faith is the same, the difference between them consisting in the form and mode of church government. To constitute a member of any church, two points at least are essential, without meaning to say that others are not so, a profession of *its faith and a submission to its government. The native of Canada, however pure may be his republican doctrines, however sincerely he may believe our *247 constitutional and logal principles to be sound, and our political faith, the only true faith, does not thereby become a citizen of the United States.
These persons then, after they withdrew, did not continue members of the Reformed Dutch Church simply because they held the same religious faith and tenets with the members of that ecclesiastical body.
Upon the argument, the counsel of the defendants, holding in their hands the constitution of the Reformed Dutch Church, and avowing it to be their guide and obligatory on them, admitted that to remain members of that church and to retain their stations there, they belong to a classis and synod, and therefore they alleged that after they withdrew from the classis of Bergen, they offered themselves to and were accepted by, the True Reformed Dutch Church. There is only then, it was said, a change from one church judicatory to another, and the standing of the defendants as members of the Reformed Dutch Church is not thereby affected. The argument renders some knowledge of the history of the True Reformed Dutch Church desirable.
In October, 1822, ten persons, five ministers and five elders and deacons, met and organized themselves into an ecclesiastical body, which they called the classis of the True Reformed Dutch Church in the United States of America. They published to the world the reasons and grounds of their organization. They complained with a minuteness of detail unnecessary to bo here repeated, that the church once noted for its soundness in the faith had become corrupt in its principles and practice. They alleged a prevailing laxness of discipline and prostitution of the sacred ordinances of the gospel, and declared as follows, “We, the undersigned, ministers, elders and deacons have unanimously agreed to restore the church to its original purity, and together with the congregations under our care, do unite in-declaring ourselves the True Reformed Dutch Church in the United States of America, and as a rule of our faith and *248 practice do abide by all the standards ratified and established in the National Synod held at Dordrecht, in the years 1618 and *1619, without the least alteration, by which act we do not separate from, but remain the identical Reformed Dutch Church.”
At the same meeting, they resolved that until their numbers were sufficiently increased to be divided into classis and synods, the judicatories in the church should consist of only two descriptions, consistories and a classis; and the classis should be known and distinguished by the name of the True Reformed Dutch Church, in the United States of America.
Having referred to the number of those who organized this body, it may not®be unprofitable to stop a moment to learn the number of the ancient body called the Reformed Dutch Church. The source of information afforded us by the evidence is the statistical tables contained in the minutes of the general synod. The minutes of 1821 and 1822, contain no tables. By the minutes of 1823, there were one hundred and twenty-three congregations and seventy-four pastors, exclusive of the classis of Paramus and Long Island, .Albany and Washington, from which no reports were that year made. They in 1824 contained forty-eight congregations and twenty-five pastors. Together, one hundred and seventy-one congregations and ninety-nine pastors. From which we may 'safely conclude the number did not much vary in 1822.'
In June, 1824, the classis of the True Reformed Dutch Church resolved that the body should be thereafter known and distinguished' by the name of the General Synod of the True • Reformed® Dutch Ohurc-h in the United States of, America, and organized two classis, by the names of Hackensack and Union, under the care of the synod. The True Reformed Dutch Church then contained, according to the table published in their minutes, sixteen churches or congregations,-ten ministers, two candidates and one cate *249 chist. In 1825, the general synod of that church contained twenty-one congregations and twelve ministers. In 1826, the like numbers, according to the table in the minutes of their synod, the last enumeration we have before us.
On the 2d Pebruary, 1824, a meeting of the minister and all the elders and deacons, composing the consistory of the church of the English Neighborhood, was held. Commissioners of the classis of the True Reformed Dutch Church attended, and having asked whether the consistory had determined unanimously *to dissolve their connection with the classis of Bergen and general synod, and to place themselves and the church, under the care of the classis and synod of the True Reformed Dutch Church, and each one of the deacons and elders having answered in the affirmative, the usual token of reception was given to them by the commissioners. A minute was made on the books of the consistory. At the succeeding meeting of the classis, the name of synod not having been yet taken, of the True Reformed Dutch Church, in June following, upon application from the minister, elders and deacons of the English Neighborhood, they were, by vote and record on the minutes, received into connection with and under the care of the classis, and one of the elders as the representative of the church, took a seat in that body.
In June, 1825, a committee of the general synod of the True Reformed Dutch Church, made a report to that body proposing that the ministers, elders and deacons who composed the synods, classis and consistories of the Reformed Dutch Church, so called, and all those members who then were and should continue to remain in communion with and subject to them, should be excommunicated. The consideration of this report was deferred until the ensuing session in June, 1826, when the subject was indefinitely postponed. I advert to these proceedings merely to shew their recognition of the existence of the ancient body and the avowal of their separation from it. In the report it is said, “We *250 have separated from the synods, classes and consistories of the Beformed Dutch Church, so called, for substantial scrip-: tural reasons.” In the preamble of the resolution for indefinite postponement, they say, “ the separation between us and the body styled the Beformed Dutch Church, is of such a nature and for such reasons, that there can be no ecclesiastical communion between us and them until the ministers and members of that body return to the ground from which they have departed.” In the pastoral letter-of June, 1825, they speak of “ The stand we have been enabled by divine grace to take in pleading with our mother, by a formal and public separation from her communion.”
Such being the prominent points in the history of these transactions, so far as I deem them material to the right understanding of the subject before us, the question recurs whether this body called the True Beformed Dutch Church is the Beformed *Dutch Church mentioned, known and recognized in the act of the’ legislature for the incorporation of religious societies. If this body is the Beformed Dutch Church so known and recognized, and if the classis to which the consistory became and yet is attached, is a legitimate and constitutional judicatory of that church, then do the minister, elders and deacons in question belong to the Beformed Dutch Church; otherwise so far as respects themselves and their own acts, or as their connection with that church may depend thereon, they have ceased to be its members.
Prom the constitution of the Beformed Dutch Church and from precedents in the acts • and proceedings of the Beformed Dutch Church and of the True Beformed Dutch Church, it appears that the formation of a new congregation or consistory or church judicatory, in connection with -and subordinate to that church, is to be made with the consent and by the authority of the proper ecclesiastical assembly. A portion 6of the members of the church, or converts professing its faith, cannot by their own act and without the sane *251 tion prescribed by the constitution, form a new consistory, classis or synod within the pale of the church. Rules of church government, art. 29, 30, 31. Explanatory articles, 39, 52. Acts and proceedings of General Synod of 1800, 1809, 1821. Acts and proceedings of True Reformed Dutch Church, 1824. Indeed this principle so evidently results from the very nature of regular government, that a reference to reasoning or authority seems unnecessary to establish it. A new state cannot be admitted into this Union without the consent of congress; nor can a new state be formed or erected within the jurisdiction of a state or by the junction of two or more states or parts of states, without the consent of the legislatures of the states concerned as well as of congress.
The position maintained by the defendants’ counsel, that there may be and are distinct ecclesiastical bodies in this church, is true. It is shewn not only by article 51 respecting the Dutch and Walloon churches, which was cited, but by the whole frame of government. There are distinct-classes and particular synods everywhere. But they, like the Dutch and Walloon churches, are connected together and have a common head and governor in the general synod.
*The ecclesiastical body then which was formed in 1822, and called first the classis, and afterwards the general synod, of the True Reformed Dutch Church, not having been organized in the manner provided and sanctioned by the constitution of the Reformed Dutch Church, cannot be deemed a constitutional judicatory of that church. Indeed they do not themselves claim so to be, but avow themselves to have separated from and to be disconnected with that body.
I do not mean to say they had not lawful right and good grounds to withdraw from the ancient church, and to constitute a new church. We are not called to express any opinion on that point. Nor do I mean to say they are not *252 entitled to the most full and free enjoyment of religious rights and privileges and to worship the Almighty according to the dictates of their own consciences.
I mean simply to say, as indeed they themselves in effect say, the new body is not a judicatory of the Reformed Dutch Church. .
Is then the body formed in 1822, the Reformed Dutch Church, the body known and distinguished as such in the act respecting religious societies, which had existed many years before, both de jure and de fasto, and which, as all admit, exists and acts, de faeto at the least, to the present hour ? These bodies are separate, distinct and independent. Both cannot then be the Reformed Dutch Church. The new body can be so only by taking the place of the old, now defunct. Is then the ancient body dissolved ? Its classes, consistories, synods, destroyed ? Its ministers deposed ? Its people no longer members of a lawfully constituted church ? And all, without process, trial or condemnation. Have they lost all their civil and ecclesiastical rights by the formation qf the new body, even if the allegation is true that errors of doctrine and of practice had crept in among them ? To enter on a course of reasoning to resolve these questions is superfluous. Ho one, as it appears to me, will hesitate to answer them in the negative.
By this view of the case, it is, I think shewn, that the minister, elders and deacons of the English Neighborhood, so far as depended on themselves and their own will, were separated from and ceased to be a minister and elders and deacons of the Reformed Dutch Church.
*We are now to enquire what has been done on the part of the church, of which prior to January; 1824, they were as is admitted, members and officers.
At a meeting of the classis of Bergen on the 18th February, 1824, to which classis the congregation of the English Neighborhood belonged, the Rev. Cornelius T. Demarest, then the- minister of that congregation, was suspended from *253 the office of the ministry. Was this suspension within the jurisdiction of the classis? The jurisdiction, I understand to be expressly given by the 39th explanatory article. — • “ Classes are invested with the power of approving or disapproving calls and of ordaining or deposing ministers or dismissing them when called elsewhere.” The shortness of the notice given to the minister to appear and defend himself was the subject of some forcible remarks on the argument at the bar, and when we recur to the deliberate procedure of courts of law, the time seems indeed to have been brief. I find however no rule prescribed in the constitution of the church, and of course it is subject to the discretion of the classis. The sentence of suspension then appears to have been a judgment of a competent court, within its jurisdiction, having authority over the party and the subject, liable to an appeal to a higher tribunal by any one aggrieved, from which, however, no appeal was taken; and to which, therefore, we are bound, sitting in another judicatory, to give respect and effect, without enquiring into the truth or sufficiency of the alleged grounds of the sentence.
On the same day, the classis proceeded to investigate the charges against the consistory or the elders and deacons; and after hearing the evidence, which is spread on their minutes, they delared vacant the seats of the elders and deacons as members of the consistory of the church at the English Neighborhood, and deposed them from their respective offices.
The jurisdiction of the classis in such case, is, I think, fully sustained by the constitution. The prosecution was instituted and the charges were made, if is to be observed, against the whole consistory, against all the elders and deacons. It was therefore a case not within the seventy-ninth article, which provides for a decision by the particular consistory and that of the next adjacent church. It was obviously a case to which the *particular consistory was incompetent. From the nature of government in gen *254 eral, it would seem that a remedy should be sought in the next higher judicatory. -Article thirty. “ A greater assembly shall take cognizance of those things alone which could not be determined by a lesser.” Article thirty-six. “A classis has the same jurisdiction over a consistory which a particular synod 'hath over a classis and a general synod over a particular.” Explan. Article 39. “ Classes have cognizance of whatever respects the welfare of their particular churches, for the management of which the consistories may be incompetent".” Appendix 261. “ Any lower judicature as a consistory or classis, esteeming itself aggrieved by the judgment or censure of an higher, enjoys the same privilege ” [of appeal.] In addition to these clauses, we find a practical illustration of the subject in a resolution of the general synod, in June, 1823, directing the classis of Paramus to depose the consistory of a particular congregation, and to organize a new one.
Here are then the sentences of a competent tribunal, in the exercise of its constitutional jurisdiction, deposing the elders and deacons as well as the minister, from their respective offices; and from the combined force of their own acts and the acts of the church by its judicatory, without estimating the relative influence of either, it seems to me to.be fully established that the then incumbents ceased to be the minister, elders and deacons of the Dutch Beformed Ohurch of the English Neighborhood.
Upon the argument at the bar, it was insisted, notwithstanding the acts of the incumbents and the proceedings against them, they remained trustees, inasmuch as the act of the legislature declares that every minister, elder or deacon constituted a trustee, shall continue in -office until another person shall be elected, appointed or called in his stead; and that although the act elsewhere, says the minister, elders and deacons, for the time being, shall be trustees, they can be superseded, as trustees, only by a new election, appointment or call. There seems some incongruity in the *255 doctrine that if the incumbents regularly resign or are lawfully deposed from the eldership or deaconship, they nevertheless remain trustees until others are elected. We need not, however, at present, examine whether this position is correct. *For, as has already been remarked, unless the lessors of the plaintiff were duly elected and constituted elders and deacons, and thereby trustees, they cannot recover the premises in this action, whatever, may be the condition of the defendants.
It remains then to enquire -whether they were so elected and constituted.
After the elders and deacons were deposed as already mentioned, the classis ordered the male members in communion to meet and elect others to fill their places. An election -was held, but was afterwards, at a meeting of the classis, in April, 1824-, declared irregular, and set aside, and a new election ordered, the following resolve having been first adopted, “ On request made by certain members of English Neighborhood Church, Resolved, that the mode heretofore used for electing elders and deacons in the church of the English Neighborhood, be and hereby is altered; and that in future, the members of the consistory shall be chosen by the male members in full communion.”
An election was held accordingly on the 1st of May; the persons then elected were ordained on the ninth of May; and at a meeting of the classis in December following, a report of the election and ordination was made, accepted by the classis, and the persons therein named were declared to have been duly ordaiued to their respective offices.
To avoid any mistake, it may be useful here to notice that all the incumbents named in the pleadings are not on either side precisely the same as they were in 1824-, some changes having been made by subsequent circumstances. It is, however, admitted in the state of the case before us, that the elders and deacons who were elected on the 1st of May, 1824, were regularly sworn into office, and that the elders *256 and deacons on both sides have from that time onward, regularly taken the prescribed oaths; so that the subsequent changes are not material as to the result of the matters in controversy.
The question whether the elders and deacons of the 1st of May, 1824, were elected and constituted according to the manner, usages and customs of the Reformed Dutch Church, is according to what I deem the just construction and effect of the eighteenth section of the act respecting religious societies, closed by the act of the classis of December, just now mentioned. “ If *any dispute shall arise respecting •the validity of the election, appointment or call of the said trustees, the same shall be referred for final decision to the superior church judicature to which such congregation is subordinate according to the customs and constitution of the said Reformed Dutch Church.” The legislature have wisely placed this matter in the proper hands. Whomsoever the church judicatory decide to be the spiritual officers, we are bound to respect as such, and consequently as the trustees.
The language of the section fairly and fully excludes any power in this court to decide on the validity of their election, appointment or call. The decision of the church judicatory is not final if we may afterwards examine its merits. I do not mean that we may not in a regular manner enquire who are the officers or by what authority individuals exercise these functions. But in my opinion, according to the intention of the legislature, the solution of such enquiries is shewn by the decision of the church j udieatory. If we ask, as we doubtless mays do, by what warrant individuals exercise the powers and duties of minister, elders and deacons, they may answer, by an election, appointment or call, the validity of which, has been decided and sustained by the superior church judicatory to which the congregation is subordinate. Such being the fact, ulterior enquiry, on our part, is closed; and I think, with much propriety and wisdom.
*257 Notwithstanding such is, in my judgment, the law whereby we are to be governed, I shall proceed briefly to ■consider, as it may not be without profit, the conformity of the election to the usages and constitution of the church, at least so far as objections were raised to it upon the argument.
1st. The power of the classis to order a new election. Assuming that the seats of the former consistory were vacant, the power of the classis to provide for supplying their places by a new election is shewn by the articles 30 and 36, and the explanatory article 39, which I have quoted in another place. It is further supported by the spirit, if not by the letter, of the 38th and 39th articles.
2d. The power to sot aside the election reported by the Rev. *Mr. Van Santford. The irregularity and illegality of that election are obvious and uncontroverted. It was made prematurely, before the arrival, and without the presence of the clergyman appointed, according to the usage of the Dutch Church, to preside on such occasions. No regular minute was made of their proceedings; nor did it .appear that the electors had been called together or in any wise notified of the election. Such being the case, the -classis, the next higher church judicatory, was the proper tribunal by which that election should be declared illegal and set aside. Article 39; Explan. art. 39. Moreover the persons then chosen were afterwards chosen at the subsequent election, and under it accepted the offices, whereby both they and the electors adopted and ratified the act of the classis ordering a new election.
3d. It was objected that the classis altered, without authority, the mode of election.
The ancient mode of choosing elders and deacons, long used in that congregation, as appears by the consistorial records, was, according to one of the modes pointed out in the 26th explanatory article, by the consistory for the time being. Inasmuch, however, as at the period in question *258 there was no consistory, necessity required that some other mode of election should be pursued. The only mode left was prescribed, to wit: by the members; as both the others required an interference of the consistory. The classis rather pointed out the mode which the exigency of the case required than made an alteration. Unless this mode had been pursued, there could not have been another election. The 26th article just referred to does, however, provide for an alteration, and does not as was argued, require the application' for that purpose to be made by the consistory alone. In the present case a previous application was made, and by members of the church.*
4th. It was objected that the' choice was unlawfully restricted to the male members in'full communion.
*1 am not satisfied there has been illegal restriction. If the term “ members of the church,” in the †26th explan, article, be in any wise vague, it is explained by the ‡22d article, in pari materia, to which also the ||24th article refers, “ the members in full communion.” Whether the term members has been held in practice in the Dutch Ohurch in general, to extend the right of suffrage to females as well as males, I have not found in the evidence, *259 precise information. It cannot be said there has been in that congregation any custom or usage which has given a construction to the constitution including females in the right to vote; for as already mentioned the members to fill up vacancies in the consistory have been chosen by the consistory, from time to time, for many years and during the whole period of which their minutes have been furnished to us. In June, 1823, the classis of the True Reformed Dutch Church, recognized an election of elders and deacons in the congregation of Charleston, in the state of New York, which had been made by the male members in full communion. Where or how then is it shewn that the females were accustomed to vote in the choice of these officers or were entitled to do so ? I cannot say, from the evidence, that the rights of any persons have been illegally withheld. On the part of those, if any, who may have been affected we hear no complaint.
*From a careful and anxious examination of this cause, the deep interest and importance of which all must feel and realize, I am led to the conclusion that the elders and deacons wTbo are the lessors of the plaintiff have shewn themselves to be the legal trustees, and as such entitled to the premises in question. I repeat a sentiment I wish distinctly to be understood, that in wdiat I have said, I mean not to make the most remote allusion to the propriety or impropriety, the policy or impolicy of the secession of the True Reformed Dutch Church, in a religious or spiritual sense. I seek only its legal effects and consequences.
In my opinion, judgment should bo rendered for the plaintiff.
Ford, J. This ejectment is'brought for a lot of land belonging to the Reformed Dutch Church at the English Neighborhood, in the county of Bergen. The lessors of the plaintiff call themselves the elders and deacons of that church, elected, appointed and called as such, conformably to the statute of the 12th. of June, 1799, Lev. Laws, 477. *260 By the 12th section of that statute, “ the minister or ministers, elders and deacons for the time being, of every Beformed Dutch congregation, shall be trustees of the same, and a body politic and corporate in law,” with power to hold lands in trust for the use of such congregation. But their election, appointment and call are contested by the defendants, who deny the regularity and legality of the same, and claim the said offices for themselves. The lessors of the plaintiff admit that the defendants were such officers on'the first day of January, 1824, but allege that since that time they have been lawfully deposed and removed, and the lessors of the plaintiff duly elected and ordained in their stead. To judge of the legality of this alleged deposition and removal of the defendants and promotion of others to their places, some principles in the charter, constitution, usages and customs of this church, must be mentioned. By the 12th section of the above statute, the legislature has granted to the Beformed Dutch Ohurch, one very remarkable peculiarity, that its temporal property should be vested in none but its spiritual officers, that is, in its ministers, elders and deacons, who are called the consistory of the congregation. The constitution of the church acknowledges *four spiritual judicatories, which, according to their grades, beginning with the lowest, are the following : First, the consistorial, in each congregation, consisting of the minister, elders and deacons, thereof. Second, the classical, composed of a minister and elder from each one of a number of neighboring congregations, who being assembled together, constitute a classis. Third, a particular synod, consisting of deputies from four or more neighboring classes. Fourth, a general synod, composed of deputies from each particular synod. A classis has the same jurisdiction over a consistory, that a particular synod has over a classis, and a general, over a particular synod.
A classis has power' to ordain and depose ministers, and take cognizance of everything concerning the welfare of *261 their own churches, (to the management of which a consistory may be incompetent. (Book Constit. page 332, art. 39.) If any person shall feel aggrieved by the decision of a lesser assembly, he'has the right of appealing to a higher. (Ib. page 274, art. 79.) If elders or deacons have committed any public gross sin, they shall be removed from their office by the consistory of their own and next adjacent chucrh. (Ib. page 294, art. 79).
It appears that a few congregations which formerly belonged to the Beformed Dutch Church, seceded from it several years ago, and renouncing its communion, formed a separate association among themselves, taking for distinction the name of the True Beformed, and publishing in a pamphlet to the world their reasons for such separation.
On the 29th of January, 1824, the defendants, who up to that time were undeniably the regular minister, elders and deacons of the church at the English Neighborhood, composing its consistory, took measures which drew down upon them, from their sister churches, a charge of public schism. They assembled officially at the parsonage house as a consistory, in conformity to their own wishes, and those of a part of the congregation, and there adopted and published the following resolutions: First, that the classis of Bergen, (the judicatory immediately superior to them) had tolerated false doctrine (which the general synod had done also) and passed illegal and unconstitutional orders; therefore that their connection with the classis of Bergen and the general synod of the Beformed Dutch Church is *dissolved ; Second, That they acknowledge subordination to none other than the True Beformed Dutch Church, whose reasons for separating from the general synod, as contained in a printed pamphlet, they approve of; third, That they are, and design to remain, what they always have been, a True Beformed Dutch Church, adhering steadfastly to its constitution. On the 2d of February following, the same consistory assembled again at the parsonage house, where they met regular depu *262 ties from the True Reformed, and avowed to them their unanimous determination to dissolve their connection with the classis of Bergen and general synod, and. to place themselves and their church under tKe care of the classis and synod of the True Reformed ; whereupon the delegates of the True Reformed, in token of their reception, gave the right hand of fellowship to each member of the said consistory.
The classis of Bergen being thus formally renounced by the members of this consistory, assembled on the 17th of February, 1824, and cited the minister, elders and deacons to appear the next day before them, and to answer charges specified in said citations, one of which charges was schism. The citations were served personally on each member of that consistory, except two of the deacons, at whose houses they w.ere left on account of their being from home; and each member except the two deacons, gave a verbal answer, that he should not appear or answer. Next day, none of them appearing, classis, at the appointed hour, took the examination of witnesses and other evidence in support of the charges, all of which they found to be true. Whereupon classis suspended the minister from the ministry in the Reformed Dutch Ohurch, and dissolved the pastoral connection between him and the congregation at the English Neighborhood. They also deposed each of the elders and deacons of that congregation, and passed an order for the election of others in their places. An election accordingly took place in the congregation, and other members were chosen and duly certified to classis on the 29th of April, 1824, together with the manner in which the election was conducted. Whereupon classis resolved, first, That the conducting of the election had been irregular and they ordered it to be set aside for irregularity ; second, That the deposition of the two deacons on *whom no citations were served personally, had been irregular, therefore that their deposition be reversed and *263 tlie deacons be restored; third, That a new election be holden in the said congregation on the first Monday in May following, for the choice of four elders and two deacons, in the places of those whose deposition and removal had been ordered; fourth, That the mode of electing elders and deacons theretofore used in that congregation be altered; and that in future the consistory be chosen and elected there, by the male members of the church in full communion, agreeably to the request of a part of the said congregation. In pursuance of these resolutions, an election was made of four elders and two deacons, (who are the present lessors of the plaintiff); and their election and ordination being duly certified, were confirmed by classis on the 21st December, 1824.
It is alleged by the defendants, that their deposition and removal from office and the subsequent election of the lessors of the plaintiff, were measures to which the power of classis was incompetent, and its proceedings illegal and void. They insist,
First, That the power of deposing elders and deacons does not reside in classis by the constitution and usages of the church, the 79th article whereof, page 294, provides expressly, “ that if elders or deacons have committed any public gross sin, they shall immediately be removed from office by the consistory of their own and the next adjacent church; so that no classis has any power in their removal. To which the plaintiff answers, that here the whole consistory stood accused of a joint offence, and it was absurd that they who were the parties accused, should try themselves; that the 79th article could not receive so absurd a construction, as it would clash with the 24th section of the statute, which declares that no member of corporation shall vote in any matter or thing which immediately concerns himself; and as the consistory of the next adjacent church could not act alone, the power devolved on classis by the express •words of the 39th article, page 332, “that classis shall have *264 cognizance of whatever respects the welfare of their particular churches, for the management of which the consistories may he incompetent."
Second, That if the classis had the power, they never tireless-*exercised it in an illegal, oppressive manner, in allowing the [members of consistory not so much,as one-entire day, after charges were first exhibited against them,, to prepare their evidence and defence, in a case affecting: their offices,?Jand implicating their moral and religious-characters. They were charged and cited on the 17th, to-answer on'the 18th at an early hour. To this the plaintiffs answer that the citation was for their appearance on the 18th, but by no means for their trial. If they chose to ask further time for preparation it would have been granted by classis, according to their well known usages, and the practice of all courts. But they were contumacious and sent word that they would not appear. Olassis was compelled to proceed ex parte, and could Dot have reference in respect of time to any convenience but their own, and that of the witnesses in attendance.
Third, That classis had no power to alter the mode of election in this congregation, by a disfranchisement of female members, who had always exercised the right of suffrage, and vesting|it exclusively in male members. In answer to-this, the plaintiffs rely on the 2Qth article, page 318, which declares, “ that the manner of choosing elders and" deacons is not rigidly defined; but where any mode has for many years been followed in any church, there shall be no variation or change hut hy previous application to the classis, and express leave first obtained for altering such custom.” Such, previous application being made in this case, classis had a discretionary power and jurisdiction, under this article, to alter or not, without the infringement of any rule; and in '.doing it, they gratified every member of the Reformed Dutch Church, to the discontent of none but those of the True Reformed, who no more belonged to their communion.
*265 Fourth, That the word True is assumed by the defendants only for distinction, not to make any alteration in substance, for that they still are, and design to remain, what they always have'been, a True Eeformed Dutch Church, adhering steadfastly to the constitution of the Eeformed Dutch Church. To this assumption the plaintiffs answer, that the Eeformed Dutch Church, as incorporated by law* has for the essence of its constitution, four church judicatories, a uniform doctrine of faith, *and a communion; and there is nothing more inconsistent and absurd, in the nature of things, than a profession of adherence to this constitution, connected with a revolt from all its judicatories, a condemnation of its doctrines for falsity, and a solemn renunciation of its communion. That they might as well profess their steadfast adherence to the constitution of the United States, and at the same time rebel openly against the authority of congress, place its judiciary at defiance, deny the power of the executive, and contract a foreign alliance.
I have made this statement of the foregoing points, and of the arguments on each side, for the sake of ascertaining what kind of law -is in dispute before us. It is not the common law; it is not the statute law; but it is the usages and customs, or in other words the law of the Eeformed Dutch Church, upon which the points in controversy depend. And an important enquiry presents itself, whether any of the foregoing points are cognizable in this court. The right of the land in question is clearly vested by statute in the minister, elders and deacons of the congregation, elected, appointed or called, according to the manner, usages and customs of the Eeformed Dutch Church ; but is this court to determine whether those spiritual officers have been elected and ordained according to the laws and usages of the church ? If the church and its judicatories are satisfied with them can this court depose and cashier their ordained minister, elders or deacons ? By no means. The power of doing so is taken away from us expressly, by the *266 18th section of the act of incorporation. It says, “ if any dispute shall arise respecting the validity of the election, appointment or call of the said elders and deacons, the same shall be referred for final decision to the superior church judicature to .which such congregation is subordinate.” The next superior church judicature above the consistory is classis, and to it this court is directed to refer for a decision whether the election and ordination of these elders and deacons has been agreeably to the customs and usages of the church. Olassis is to determine whether elders and deacons are to be deposed and removed by consistories or by itself; what length of time a citation for appearance must be served before it is returnable ; under what circumstances a classis has power to alter the mode of electing officers in a congregation; *and whether it will acknowledge any persons as members of the Reformed Dutch Church, who renounce its judicatories, deny its faith and doctrines, and-reject its communion. If those judicatories acquiesce in calling and ordaining unworthy men to spiritual offices, or worthy men in an irregular manner, the law gives this court no controlling power, but by giving the final decision thereon to the church puts all the consequences on themselves. If this court should interfere, and notwithstanding the prohibition in the statute, take into its hands to decide finally on the election of church officers, we should have to enforce our jurisdiction how much soever the church might abhor our elders or deacons, or think their religious liberty infringed. But we are not ambitious of exercising a jurisdiction of such an unthankful kind, over this or any other denomination of Christians. I must see my authority for it very plainly before I consent to exercise it. The statute says we must refer the election and all disputes concerning -it to the church. Whoever it elects and ordains for elders and deacons we are to consider legal trustees. If the defendants feel aggrieved in respect of this election by the decisions of classis, let them appeal to the next superior tri *267 bunal of the church. Either they are members of the Dutch Reformed Church or they are not so. If members they have the right of appeal. If they are not members, by what color of right do they claim to be elders and deacons in a church to which they do not belong ? As to the plaintiffs they have been elected elders and deacons by the congregation, and their election having been confirmed by the next superior judicature of the church, it becomes a final decision by the very words of the statute, which this court has no power to review or reverse. The lessors of the plaintiff are the lawful trustees, and under their lease the plaintiff is entitled to recover the possession of the land.
Drake, J. A numerous and respectable sebt of Christians has long existed in this country under the name of the Reformed Dutch Church in the United States of America. They brought with them from Holland the discipline there established; practiced under it “ as far as their numbers and situation would permit;” and, in 1771, by a convention of delegates held at New York, formally declared their firm adherence to it in the words following, *viz: “We abide fully by the constitution of the Reformed Dutch Church in the Netherlands, as the same is established in the national synod held at Dordrecht, Annis 1618 and 1619.” And owing to its peculiar local circumstances, the 'practice of the church in America, varying in some measure from that of the original Dutch Church, a general synod of the Reformed Dutch Church in America, hold at New York in October, 1792, published certain “ explanatory articles, agreeably.to which the rules of church government of the said national synod of Dordrecht are applied and executed.” Those original and explanatory articles compose the constitution of the Reformed Dutch Church in the United States of America, that is, the declaration of its doctrines, mode of worship, and government.
The legislature of New Jersey by an act entitled “ An act to incorporate trustees of religious societies,” passed the *268 12th day of June, 1799, Rev. Laws 476, directed the mode in which such societies should elect trustees, made those trustees bodies corporate, and authorized such corporations to hold lands and other property, for the use 'of their respective societies or congregations. The 12th section of the act commences, by premising that “ whereas it is represented that according to the constitution, usages and customs of the Reformed Dutch Churches, the minister, elders and deacons thereof, for the time being, have the management of the ternporalties of said churches;” “and that the said churches cannot avail themselves of the preceding sections of this act, because they prescribe a mode of electing trustees repugnant to the constitution, usages and customs of the said churches.” And it therefore enacts, “ That the minister, or ministers, elders and deacons, for the time being, or if there be no minister or ministers, the elders and deacons for the time being, of every Reformed Dutch congregation, shall be trustees of the same, and a body politic and corporate in law by such name as the trustees shall assume, in manner hereinafter directed.”
Under this act of assembly “ The minister, elders and deacons of the Reformed Dutch Ohurch in the English Neighborhood;” were duly incorporated, on the 29th day of December, A. D. 1809, by the above name of incorporation; and thus became trustees, &c., and capable of holding lands, &c., in trust *for the use of the congregation with which they were connected. And on the same 29th day of December, 1809, the premises in question, in this cause, were conveyed by the Rev. Henry D. Polhemus and wife to the said corporation; which held and enjoyed the same until the present controversy arose. They are now in possession of Tbeophilus Bolton, who holds the same as tenant to the other defendants.
The plaintiffs allege that the defendants are not entitled to possess the said premises, because they are not the said . corporation; but that they, the plaintiffs, ar,e the real min *269 ister, elders and deacons of the Reformed Dutch Church in the English Neighborhood, and, therefore, trustees of the temporalties of said congregation, and of course entitled to the possession of the disputed premises.
It is admitted that previous to the 29th day of January, A. D. 1824, one Cornelius T. Demarest was minister, and the defendants or other persons of the party which they represent, were elders and deacons of that church. They formed its consistory; and by the foregoing act of assembly, they were trustees' of the temporalties belonging to it, and of course had the right of possession of the disputed premises.
On the 29th day of January, 1824, at a meeting held pursuant to notice, the elders and deacons of the said church being all present, together with twenty-five heads of families appertaining to the same, the following resolutions were formally passed.
“ First, That our connection with the classis of Bergen, and with the general synod be and hereby is dissolved.
“ Second, That we are, and design to remain, what we always have been, a True Reformed Dutch Church adhering steadfastly to the constitution of the Reformed Dutch Church, and to the word of God, upon which we believe said constitution to be grounded.
“ Third, That we acknowledge ourselves to be subordinate to none other than the classis and synod of the True Reformed Dutch Church, whose reasons for separating from the general synod as contained in their printed pamphlet, we approve and adopt, and do hereby declare ourselves to be united with them in the bonds of faith and love.
*“ Fourth, That James Leydecker and John Edsall be a committee to wait on the Rev. Dr. S. Freligh, with these resolutions, and know whether he has authority to receive us.”
At a meeting of the classis of Bergen, held on the 17th day of February, 1824, a memorial or complaint of the *270 conduct of the said consistory was received, purporting to be signed by sixty-two members of the church and congregation. The classis took the matter into consideration, and instituted several charges against the Rev. Cornelius'T. Demarest, and the deacons and elders, and cited them to appear before the classis, at 10 o’clock of the next day, to answer to the same.
On the morning of the next day, the 18th of February, the classis again met, and none of the members of the said consistory appearing, the classis proceeded to hear evidence of the service of the notices, and in support of the charges so preferred against the members of said consistory as aforesaid, and to investigate and consider of the same. The result was that they suspended the said Cornelius T. Demarest from the office of the ministry, and dissolved the pastoral relation between- him and the church at the English Neighborhood; and declared the deacons and elders guilty on the charges to which they had been cited to answer, and deposed them from their respective offices; which they declared vacant. ' And they at the same time directed a hew election of elders and deacons to fill the places of those so deposed.
At a meeting of the classis of Bergen, held April 20th, 1824, an election which had lately been held by virtue of the above order, was set aside, and the decision of classis of the 18th February, deposing James Lydecker and Peter W. Banta, and vacating their seats in the consistory, was reversed and vacated. And the classis, “ on request made by certain members of the English Neighborhood church, resolved, that the mode heretofore used for electing elders and deacons in the church of the English Neighborhood be, and hereby is, altered; and that in future the members of the consistory shall be chosen by the male members in full communion.”
Notice was then given for the election of new elders and deacons to supply the places of those deposed” by male mem *271 bars in full communion, on the first Saturday of May, then next. At *which time the plaintiffs in this cause, or those whom they, represent, were elected, and on the 9th day of May, 1824, were ordained elders and deacons of the said Reformed Dutch Church in the English Neighborhood. In virtue of which character, considering themselves trustees, they have brought this action of ejectment. In which action, the defendants insist, and truly, that it will not answer for’ the plaintiffs to rely merely on a defect in the title of the defendants, if such there be, but that they must go farther, and establish the right in themselves to exercise the office of trustees. It heuce becomes necessary for this court to inquire whether the plaintiffs are the true and legal trustees of said church and congregation, or, in other words, whether for the purposes of this suit they are entitled to be so considered and treated.
Who are the trustees of a Reformed Dutch Church ? The 12th section of the act already quoted, answers that the trust is vested in the minister, elders and deacons. These form the consistory. Previous to the 29th day of January, 1824, the party defendants, composed the consistory, and were, according to the act, trustees. They remain so unless some change has been legally effected. This leads to the enquiry; How can a change in the trustees be effected ? The 18th section of the same act answers, that for perpetuating a line of succession in the trustees of every Reformed Dutch congregation, the minister, or ministers, elders, and deacons of such congregation, “ shall continue in office until others shall be duly elected, appointed, or called, according to the manner, usages, and customs of the Reformed Dutch Church.” And here a question much debated at the bar arises whether the party .plaintiffs were so elected, or appointed. And this embraces two points; first, the creating, or arising, of vacancies; and second, the appointment of the plaintiffs to fill those vacancies. The plaintiffs contend that vacancies arose.
*272 First, By the seces-sio?i of the consistory, for the time being, from the Reformed Dutch Church, and consequent abandonment, or forfeiture, of their privileges connected, with it, and
Second, By the solemn adjudication of the classis of Bergen, of the 18th February, 1824, deposing the said members of consistory, and declaring their offices vacant.
*And vacancies being thus created, the plaintiffs farther insist, that they were duly appointed, and became the true consistory, and of course trustees, by virtue of the aforesaid election of the 1st of May, 1824, and the subsequent proceedings grounded thereon.
The defendants, on the other hand, deny—
1st. That the consistory of 1824, forfeited their rights by the kind of separation or division which actually took place, or that the character or legal disabilities of seceders can properly be applied to them, and
2d. That the classis of Bergen had any right or power to remove them, by their resolution of the 18th February, 1824.
And in the next place, they say that even if they were legally displaced, the election of the plaintiffs was irregular and void, because
1st. The classis had no authority to order a now election.
2d. They had no right to set aside the previous election which was held on the 24th of April under their order. And
3d. They had no right to direct that the election of the 1st of May should be held by the male members in full communion.
Were there no further provisions in the act beyond those already cited, I should feel under obligations to follow the counsel in their laborious examination of the constitution, usages and customs of the Reformed Dutch Church, and express an opinion how far the foregoing proceedings of the classis of Bergen were conformable thereto. But the legis *273 lature have, in the same 18th section, further enacted, that “if any dispute shall arise respecting the validity of the election, appointment or call of the said trustees, the same shall be referred for final decision to the superior church judicature to which such congregation is subordinate, according to the customs and constitution of the said Reformed Dutch Church.”
The legislature by this act, in reference to the Reformed Dutch Churches, not only vest the trust of the temporalities in an ecclesiastical body, but entirely decline to prescribe any new rules for their election, referring merely to their established manner, usages and customs; and in case of dispute respecting the validity of such election, they refer such dispute for final decision to the superior church judicature, to which such Congregation is subordinate according to the customs and constitution of the Reformed Dutch Church.
The validity of the election of the first of May, 1824, involves the whole question before us. If that were valid, it must be efficacious, conferring the offices, and the rights and powers appertaining thereto. It constitutes the plaintiffs (or those under whom they claim) the consistory of this church, and by force of the act, the lawful trustees. And who shall enquire into the validity of that election ? It is no ecclesiastical body, abroad or at home, that answers that question, or confers the powers lor that purpose, but the legislature of New Jersey, when prescribing rules of conduct to its own citizens, and of decision to its courts of justice. They say that it shall be referred for final decision to the superior church judicature to which such congregation is subordinate.
To what church judicature was this congregation subordinate ?
At the time when the act of the legislature was passed, and until January 1824, the Reformed Dutch Church in the English Neighborhood constituted a part of the Reformed *274 Dutch Church in the United States of America, and'were subordinate to its government and judicatories. In looking into the constitution of the Reformed Dtítch Church, (that constitution which the defendants in their resolutions of the 29th January, 1824, acknowledged and declared their resolution to adhere to steadfastly) we find that its judicatories 'were, .first, a consistory; second, a classis; third, the particular synod, and fourth, the general or national synod. The consistory is the lowest tribunal, composed of the minister, elders and deacons of a particular congregation. Next is the classis, composed of several neighboring churches. And above these are the synods. The classis has the same jurisdiction over a consistory, which a particular synod has over a classis, and a general synod over a particular.
The consistory of the. English Neighborhood was connected with and under the jurisdiction of the classis of Bergen.
Such were the government and relations of this church when its officers for the time being, together with a part of the congregation, on the 29th day of January, 1824, resolved that their Connection with the classis of. Bergen, and the general synod was dissolved, and that they acknowledged themselves subordinate to none other than the classis and synod of the True Reformed Dutch Church. But the legislature surely did not mean, that when a division should arise in one of these congregations, one part of its members should by a vote dissolve its connection with its government, so that the law by them made for the settlement of these disputes could have no operation. The superior judicatories intended are those of the Reformed Dutch Church in the United States of America, either then existing, or constituted subsequently according to the constitution and usages of that church. The judicatories might be altered, but by the 86th article, “ This shall not be attempted by any particular congregation, classis, or synod, but' on the *275 contrary, a careful observance of them is enjoined, until it be otherwise ordained by a succeeding general or national synod.” There is no pretence that other judicatories have been established in such manner. It follows that the disputes, arising respecting an election in the church at the English Neighborhood, by the act, are to be referred, first, to the classis of Bergen ; next, to the particular synod; and lastly, to the general synod of the Reformed Dutch Church. For, the constitution, art. 31st says, “That if any person conceive himself aggrieved by the decision of a lesser assembly, he shall have the liberty and right of appealing to a higher.” The election complained of was ordered by the classis of Bergen. They confirmed it; and if their decision was wrong, an appeal could have been taken to the particular synod, for by explanatory article, 46, synods have power to receive “and determine all appeals and references properly brought from the classes.” And if this body should err, an appeal can be takon to the general synod, which is authorized to receive it, by the 52nd article; and which, by the 51st, is declared to be “the highest judicatory, and the last resort in all questions which relate to the government, peace and unity of the church.” This is the tribunal to which the legislature intended that the validity of its election should be referred, for final decision. If it had been carried to this tribunal and it had declined to exercise jurisdiction, or if its decision were called in question before this court, how far upon a question of property, *we would look into it, and see that it was conformable to the customs and constitution of the Reformed Dutch Church, it is not now necessary to decide.
The consistory of the English Neighborhood could not get clear of the decision of the classis of Bergen, by changing their allegiance, but by appealing to the next superior judicatory. By an appeal and by that alone, the effect of the decision of the classis could have been suspended. They refuse to appeal, and deny the government with which they *276 acknowledge themselves to have been connected. In my opinion, the decision of the classis must stand, and the election be held valid.
I consider this question, as now presented to this court, to be a mere dispute respecting the possession and guardianship of a trust property. It is not necessary to decide upon even the interests of the defendant, as cestui que trusts, and much less, as to any spiritual matters controverted between the parties. The defendants obtained the right to office, and the custody of the temporalities of a church by connecting themselves .with it, and by submitting to its government. If they have become tired of the church, or its government, they certainly may exercise the right of withdrawing from it; but they cannot reasonably expect to carry off its offices, and its property, with them. The same judicatories, which invested them with office' have, not merely upon general principles, but by express legislative enactment, a right to decide upon the tenure of those offices, and the effect of their decision cannot be evaded by a disclaimer of their jurisdiction.
Judgment for plaintiff.

 Note, liev. Laws 478, see. V2, '• The minister or ministers, ciders and deacons for the time being, or if there be no minister or ministers, the elders and deacons tor the time being, of every Deformed Dutch congregation, shall be trustees of the same, and aliody politic and corporate in law by such name as the said trustees shall assume in the manner hereinafter directed

Note. — “On request made by certain members of the English Neighborhood Church: Resolved, That the mode heretofore used for electing elders and deacons in the Church of E. N. be and is hereby altered, and that in future the mefiibers of the consistory shall be chosen by the male members in full communion.” ■ Extract from the minutes of the classis of Bergen, April 20,1824.

Explanatory Art. 26. The manner of choosing elders and deacons is not rigidly defined. A double number may be nominated by the consistory, out of which the members of the church may choose those who shall serve; or all the members may unite in nominating and choosing the whole number without the interference of the consistory; orjthe consistory for the time being, as representing all the members may choose the whole and refer the persons thus chosen by publishing them in the church, for the approbation of the people. This last method has been found most convenient, especially in large churches, and has long been generally adopted. But where that or either of the other modes has for many years been followed in any church, there shall be no variation or change, but by previous application to classis and express leave first obtained for altering such custom.”

Artt 22. “ The elders shall be chosen by the suffrages of the consistory and of the deacons; in making this choice it shall be lawful, as shall best suit the situation of each church, either to nominate as many elders as shall be judged necessary for the approbation of the members in full communion, or to propose a double number tliat the one-half of those nominated may be chosen hy the members.”

Art. 24. “The deacons shall he chosen, approved and confirmed in the same manner as the elders.”
The articles were adopted in 1771; the explanatory articles in 1792.