COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, Athey and Callins
Argued at Arlington, Virginia

**PUBLISHED**

ATLANTIC KOREAN AMERICAN PRESBYTERY

v.          Record No. 1930-23-4

SHALOM PRESBYTERIAN CHURCH
  OF WASHINGTON, INC., ET AL.

OPINION BY
JUDGE CLIFFORD L. ATHEY, JR.
MARCH 11, 2025

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Richard E. Gardiner, Judge[1]

Christopher A. Glaser (Jackson & Campbell, P.C., on briefs), for
appellant.

J. Chapman Petersen (Won Y. Uh; Chap Petersen & Associates,
PLC, on brief), for appellees.


The Atlantic Korean American Presbytery ("AKAP") appeals from the final order of the

Circuit Court of Fairfax County ("circuit court") declaring that the real property and other assets of

the Shalom Presbyterian Church of Washington, Inc. ("Shalom"), were not held in trust for AKAP

nor the Presbyterian Church, U.S.A. ("PCUSA"). The basis, in part, for the circuit court's

declaratory judgment was the underlying determination by the court that Shalom is not a member of

PCUSA and was therefore not bound by PCUSA's Book of Order. Thus, on appeal, AKAP

assigns error to the circuit court's declaratory judgment based, in part, upon the circuit court

ruling being violative of the ecclesiastical abstention doctrine as a result of its declaration that

---

[1] Judge Gardiner entered the final order in this case. Judge John M. Tran entered a
January 30, 2023 consent order and a May 4, 2023 order granting a motion to admit an attorney
*pro hac vice*. Judge Steven C. Shannon entered an August 1, 2023 joint stipulation between the
parties, detailing that sworn affidavits and deposition transcriptions were permissible evidence to
support their respective motions for summary judgment.

Shalom was not a member of PCUSA and, therefore, not bound by the Book of Order. In support, AKAP contends that when Shalom initially filed a complaint with the Mid-Atlantic Synod (the "Synod") to prevent AKAP from exercising control over Shalom's real property and assets, Shalom admitted that it was a PCUSA member and therefore subject to the Book of Order. AKAP further asserts that only after PCUSA's internal ecclesiastical tribunals produced an undesirable outcome did Shalom seek intervention by filing a declaratory judgment action in the "secular" circuit court. As a result, AKAP contends the circuit court lacked jurisdiction when it unconstitutionally "impos[ed] its own interpretation of church doctrine to declare who is, and who is not, a member of AKAP." For the following reasons, we reverse the circuit court's judgment for lack of jurisdiction.

## I. BACKGROUND[2]

### A. *PCUSA and AKAP's governance structure and ecclesiastical background*

As presented in the record, PCUSA is a hierarchical church consisting of four levels of organizational governance with each level granted increasing authority, including: 1) sessions; 2) presbyteries; 3) synods; and 4) the General Assembly. At each level, the individuals comprising each governing body are referred to by PCUSA as "presbyters" who are otherwise known as "ruling elders and teaching elders." Each of these governing groups is considered a "council" by PCUSA. A session governs a specific, local congregation or church; a presbytery has jurisdiction over the sessions (churches) within its geographic bounds; a synod is a regional governing body with oversight over at least three presbyteries; and the PCUSA General Assembly is responsible for the governance of the entire denomination, overseeing 16 distinct

---

[2] "[W]e review the record applying the same standard a trial court must adopt in reviewing a motion for summary judgment, accepting as true those inferences from the facts that are most favorable to [AKAP,] the nonmoving party." *Stahl v. Stitt*, 301 Va. 1, 8 (2022) (quoting *Fultz v. Delhaize Am., Inc.*, 278 Va. 84, 88 (2009)).

synods.  Though all of these "councils are distinct," they "have such mutual relations that the act of one of them is the act of the whole church."

PCUSA governs the Synod,[3] AKAP, and its adhering churches through its Constitution. PCUSA's Constitution is divided into two parts.  Part I is the Book of Confessions, which contains PCUSA's "statements pertaining to matters of faith and what the [PCUSA] believes." Part II is the Book of Order, which "prescribes rules for internal governance, discipline, and appeals."  "The Book of Order is the governing document of [PCUSA] and [to the entities underneath PCUSA] within its hierarchical structure."  In addition, the Book of Order grants presbyteries "the power of authority" when it comes to regulating PCUSA's "member churches."[4]

"The presbytery is the council serving as a corporate expression of the church within a certain district and is composed of all the congregations[] and ministers of the Word and Sacrament within that district."  Presbyteries are "responsible for the government of the church throughout its district" and are granted the power to "provide that the Word of God may be truly preached and heard."  Subject to this power, presbyteries may "organiz[e], receiv[e], merg[e], dismiss[], and dissolv[e] congregations in consultation with their members; oversee[] congregations without pastors; and establish[] pastoral relationships and dissolv[e] them." Presbyteries are also vested with the authority to "consider and act upon requests from congregations for permission to take . . . actions regarding real property."

---

[3] Relevant here, the Synod encompasses 14 presbyteries and 1,241 churches.

[4] The 2019-2023 version of the Book of Order, presented by the parties as authoritative, further notes that each council is vested with PCUSA's power with the limiting proviso that "[a]ll Church power, whether exercised by the body in general or in the way of representation by delegated authority, is only ministerial and declarative" with no "Church judicatory" permitted to make rules that "bind the conscience and virtue of their own authority."

Member churches are further referred to in the Book of Order as "congregation[s]," which are "a formally organized community chartered and recognized by a presbytery." Presbyteries may organize "a congregation" by receiving an application for membership in PCUSA from "persons wishing to unite" as a congregation of PCUSA.[5]  The Book of Order requires "[t]hese persons" to "covenant together" by signing on to the following:

> We, the undersigned, in response to the grace of God, desire to be constituted and organized as a congregation of the [PCUSA], to be known as _____.  We promise and covenant to live together in unity and to work together in ministry as disciples of Jesus Christ, bound to him and to one another as a part of the body of Christ in this place according to the principles of faith, mission, and order of [PCUSA].[6]

Pursuant to the terms of PCUSA's Constitution, "the members of a congregation put themselves under the leadership of the session and the higher councils (presbytery, synod, and General Assembly)."  Correspondingly, "[t]he presbytery . . . work[s] closely with the congregation in securing pastoral leadership, . . . [and] . . . in counseling concerning incorporation and bylaws for the congregation conforming to the Constitution of the [PCUSA]."

Pertinent to the use of real property by a member church, the Book of Order requires that:

> All property held by or for a congregation, a presbytery, a synod, the General Assembly, or the Presbyterian Church (U.S.A.), whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of a particular church or of a more inclusive governing body or retained for the production of income, is held in trust

---

[5] The record also contains excerpts of the 1998 Book of Order in place at the time of Shalom's admission into AKAP.  The parties requested that the circuit court take judicial notice of these portions as well.  As the rules listed between these copies of the Book of Order are substantially the same, the use of the term "Book of Order" refers to either version with differences between the two noted.

[6] The 2019-2023 Book of Order notes that after this covenant is signed, then, "[a]t its sole discretion[,] the presbytery may then declare them an organized congregation of the presbytery."  But the 1998 Book of Order omitted this proviso, instead detailing that once this covenant is signed "[t]hey shall be declared a constituted congregation of the presbytery."

nevertheless for the use and benefit of the Presbyterian Church (U.S.A.).

Further, "[w]henever property of, or held for, a congregation of [PCUSA] ceases to be used by that congregation as a congregation of [PCUSA] in accordance with this Constitution, such property shall be held, used, applied, transferred, or sold as provided by the presbytery." Also, the Book of Order mandates that a church, ruled by a session, "shall not sell, mortgage, or otherwise encumber any of its real property" nor "acquire real property subject to an encumbrance . . . without the written permission of the presbytery transmitted through the session of the particular church." The Book of Order further provides that "[t]he relationship to [PCUSA] of a congregation can be severed only by constitutional action on the part of the presbytery."

When in-church disputes arise, PCUSA's "[j]udicial process" provides "the means by which church discipline is implemented within the context of pastoral care and oversight," constituting "the exercise of authority by the councils of the church for the prevention and correction of irregularities[7] . . . by councils."[8] The Book of Order further notes that this process is conducted through PCUSA's "[e]cclesiastical jurisdiction," which it defines as "a shared power, to be exercised jointly by presbyters in councils." This jurisdiction "is limited by the express provisions of the [PCUSA] Constitution." But "[p]owers not mentioned in th[e] Constitution are reserved to the presbyteries." A council's "ecclesiastical jurisdiction" extends to "fram[ing] statements of faith, bear[ing] testimony against error in doctrine and immorality in life, resolv[ing] questions of doctrine and discipline, . . . and decid[ing] issues properly brought before them under the provisions of th[e] Book of Order." Sessions, which are "the council for

_____

[7] The Book of Order provides that a "[a]n irregularity is an erroneous decision or action."

[8] The Book of Order defines these types of cases as "remedial cases."

- 5 -

the congregation," generally have authority to govern the congregation, and sessions retain "original jurisdiction" to resolve its disputes. In the case where a session cannot exercise its authority to assist with a dispute, "[a]fter a thorough investigation, and after full opportunity to be heard has been accorded to the session, the presbytery may conclude that the session of a congregation is unable or unwilling to manage wisely its affairs, and may appoint an administrative commission[9] with the full power of session" to step in.

"An installed pastoral relationship may be dissolved only by the presbytery." In such cases, "the presbytery may enquire into reported difficulties in a congregation and may dissolve the pastoral relationship if, after consultation with the minister of the Word and Sacrament, the session, and the congregation, it finds the church's mission under the Word imperatively demands it." In particular, the Book of Order provides in such cases, "[w]hether the minister of the Word and Sacrament, the congregation, or the presbytery initiates proceedings for the dissolution of the [pastoral] relationship, there shall always be a meeting of the congregation to consider the matter and to consent, or decline to consent, to dissolution." Where a person or council has "[a] complaint of an irregularity in a particular decision or action, or alleg[es] a delinquency," they may initiate a case by filing a complaint with the appropriate council, "submitting to its jurisdiction."[10] Particularly, when a session files a complaint against the presbytery, its complaint must be filed with the synod.

PCUSA notes in its Book of Order that the use of the judicial process evokes the church's disciplinary power. Further, PCUSA states in the Book of Order that "Church discipline is the

---

[9] The Book of Order provides that "[a]dministrative commissions are designated to consider and conclude matters not involving ecclesiastical judicial process, except that in the discharge of their assigned responsibilities they may discover and report to the designating council matters that may require judicial action by the council."

[10] This complaint may also request a stay in enforcement pertaining to the underlying irregular decision.

church's exercise of authority given by Christ, both in the direction of guidance, control, and nurture of its members." And, related to discipline, the Book of Order notes:

> The church's disciplinary process exists not as a substitute for the secular judicial system, but to do what the secular judicial system cannot do. The purpose of discipline is to honor God by making clear the significance of membership in the body of Christ; to preserve the purity of the church by nourishing the individual within the life of the believing community; to achieve justice and compassion for all participants involved; to correct or restrain wrongdoing in order to bring members to repentance and restoration; to uphold the dignity of those who have been harmed by disciplinary offenses; to restore the unity of the church by removing the causes of discord and division; and to secure the just, speedy, and economical determination of proceedings.

B. *Shalom's involvement with PCUSA and AKAP*

In 1982, Shalom was organized as an independent Christian church for Korean-speaking immigrants.[11] Pastor Bo Chang Seo ("Pastor Seo") became the church's head pastor in 1988 after graduating from a non-denominational seminary. Ten years later, AKAP was formed as a "regional Presbytery" within the Synod for the purpose of serving Korean American churches, becoming the fourteenth presbytery in the Synod. AKAP was comprised of "several churches . . . throughout Virginia, Maryland, and the District of Columbia." The initial AKAP charter listed 19 member churches but explicitly identified Shalom and seven others as "Non-Presbyterian Church (USA) . . . members."

Pastor Seo acknowledged that he submitted an application form to become a member of AKAP but denied submitting a form to join PCUSA. On the AKAP application form, Pastor Seo "check[ed] a box" to say Shalom "join[ed] and support[ed] [AKAP]." At that time, Pastor Seo provided that Shalom's AKAP application "was pretty simple" and only required Shalom to

---

[11] At the time, Shalom performed its services at different location in Fairfax County than the real property in question, while owning separate property in Stafford County. Eventually, Shalom moved to its current location in Fairfax Station, which is the location of the subject property.

"sen[d] [a] Certificate of Ordination and the minutes [sic] of the General Assembly" PCUSA meeting where Shalom's application was considered. Upon having this application approved, Pastor Seo formed a "session" at Shalom, constituting himself as the senior pastor and other church elders. Eventually, Shalom also amended its general "Standing Rule" of its bylaws, preceding its other rules of governance, to state:

> As a member church of Presbyterian Church in United States of America, we the Shalom Presbyterian Church shall be subject to observe the Book of Order in its government and structure. In the consideration of traditional faith of Korean church, however, we regulate following standing orders to administer this congregation.

Two years after joining AKAP, Shalom, through its trustees, purchased the real property at issue in this case, a church building and a single-family home used as a rectory. AKAP's members were aware of this purchase ahead of time per a conversation with Pastor Seo, but AKAP was not informed of the recording of the property's deed. Over the ensuing years, Shalom encumbered the property to, among other things, secure financing to construct other buildings and to improve the church building. Shalom also obtained court orders appointing the church's trustees, including a 2015 circuit court order that transferred "all real and personal property belonging to the unincorporated church 'to its incorporated entity.'" During this time, Pastor Seo attended annual AKAP meetings and served as the "moderator" during a 2008 AKAP conference. He also served on AKAP committees, even going as far as to note by a May of 2022 email to AKAP that he deemed "it . . . a proud thing" for him to be involved with AKAP for a "long time." And Pastor Seo was listed as a member on an AKAP "administrative commission for . . . ordination service."

Shalom also sent annual "per capita" dues to AKAP. And it submitted a petition to AKAP to ordain a new Shalom pastor. The plaque received from Shalom's ruling elders by that pastor post-ordination "contain[ed] reference to PCUSA," and Shalom had previously circulated

a bulletin "to its members saying that [Shalom] is a church affiliated with [AKAP]." Hence, for at least 15 years, Shalom was "nominally a member of AKAP." Shalom, however, began to "split gradually" from AKAP.

C. *The controversy in question*

The split between the organizations was expedited in 2022, when Shalom refinanced a loan secured against its real property to "obtain[] a more favorable interest rate" without first notifying AKAP or seeking its approval in writing. Payments on this loan were made entirely by Shalom membership, without implicating or requiring payment from AKAP or PCUSA. Eventually, this transaction was reported to AKAP, which then began an investigation into the transaction and other matters related thereto at Shalom.

Later in 2022, AKAP announced that it was investigating Pastor Seo's ordination because he may have "misrepresented his qualifications to PCUSA." As result of this investigation, AKAP subsequently determined that Pastor Seo's ordination was invalid, making him ineligible to serve as pastor. AKAP further noted that pursuant to church practice, "[i]t is customary [for] a church's membership [to be] an issue separate from a membership issue of a pastor of the relevant church. In this regard, a church may be a member of a presbytery, even if its pastor may not be." Thus, AKAP construed the issue with Pastor Seo's membership as pertaining to his personal capacity, without impacting Shalom's membership in AKAP. Shalom, by session meeting, later considered the issues raised by AKAP but decided by majority vote to not remove Pastor Seo from his position.

Eventually, the investigation boiled over into a dispute that resulted in AKAP appointing an administrative commission at a meeting on November 14, 2022, "to assume original jurisdiction over all matters pertaining to Shalom." At this meeting, AKAP decided to replace

Pastor Seo as the senior pastor at Shalom and commenced action to seize control of Shalom's real estate and assets, both actions delegated to the administrative commission.

The following day, Pastor Seo and Shalom filed a remedial complaint with the Synod, requesting that it stay AKAP's investigation and rescind the appointment of the administrative commission. In the complaint, the parties asserted that "[a]t all relevant times, [it] has been and continues to be affiliated with . . . PCUSA," that Pastor Seo "has believed in good faith that he and Shalom . . . have been members in good standing of . . . AKAP and PCUSA," and that the Synod had jurisdiction under PCUSA bylaws to resolve the dispute. The complaint insisted that AKAP's decision was misguided as Pastor Seo did not intend to "mislead" AKAP or PCUSA about his qualifications and that it "never crossed [his] mind to obtain . . . authorization" from AKAP before securing the 2022 refinancing of the property. The Synod responded to the complaint on November 25, 2022, and denied Shalom's requested relief.[12] There is no evidence in the record showing that Shalom appealed the decision of the Synod to the General Assembly.

On December 27, 2022, Shalom officially "terminated [its] connection" with AKAP through a vote of the congregation. The next day, Shalom filed a complaint in the circuit court seeking a declaratory judgment prohibiting AKAP from "exerting control over Shalom . . . and its assets." Shalom did not mention the prior Synod complaint proceedings in its civil complaint, and thus did not assert that the Synod's ruling on the complaint was fraudulent or procured by collusion. In its answer to the civil complaint, AKAP asserted as an affirmative defense that Shalom's complaint should be dismissed because Shalom was seeking to have a secular court "determine ecclesiastical questions in violation of the First Amendment to the United States Constitution and the Constitution of the Commonwealth of Virginia." AKAP also filed a

_____

[12] AKAP insists that Shalom's designation of its status as a member in the complaint, referred to its status before it joined AKAP and PCUSA, not after.

counterclaim, seeking a declaratory judgment that Shalom was "a member of . . . AKAP and . . . PCUSA" and, therefore, "subject to the Book of Order." Shalom, in turn, answered this counterclaim by denying that it was a member of PCUSA and asserted that AKAP's "claims [we]re barred by the [ecclesiastical abstention] doctrine."

The parties then filed competing motions for summary judgment, agreeing that the court could consider "sworn affidavits and/or deposition transcripts" when ruling on the competing motions. Primarily, the parties disputed whether a trust had been formed for the benefit of AKAP. In favor of its summary judgment position, AKAP argued that because Shalom purchased the property years after it joined AKAP, it held the property in an express trust under PCUSA's Book of Order. Alternatively, AKAP contended that Shalom held the property in a constructive trust given the course of dealing between the parties. Shalom countered that under "neutral principles of law" it held legal and equitable title to the real property, as it bought the land, built the church, and never demonstrated an intent to create a trust. Shalom insisted that as the "holder of the Deed," it was the "presumptive owner" and that allowing AKAP to "seize control" of the property would "violate[] the Establishment and Free Exercise Clauses of the First Amendment."

At an October 5, 2023 hearing on the dueling motions for summary judgment, the parties also disputed whether Shalom was a PCUSA member. Specifically, Shalom insisted it had not signed the required covenant with PCUSA, binding it to the terms within the Book of Order. As a result, Shalom claimed that AKAP could not prevail since such a covenant was necessary for Shalom to have consented to being a member of PCUSA, and by extension, AKAP. AKAP responded that the "course of dealing" between the parties established Shalom's PCUSA membership and submission to the Book of Order. In particular, AKAP contended that when Shalom admitted to being a member of AKAP for purposes of its Synod complaint, it also had to

- 11 -

have been a member of PCUSA. Thus, AKAP argued that Shalom was subject to the Book of Order because Shalom could not join AKAP or the Synod without being a PCUSA member. AKAP further argued that since PCUSA was "a hierarchical church," Shalom should not be permitted to "pick and choose" when it was a member. Finally, AKAP raised the existence of Shalom's "Standing Rule" as clear evidence that Shalom had agreed to be members of PCUSA and were therefore subject to the Book of Order.

Following the hearing, the circuit court ruled that "there was no express trust" created for PCUSA's benefit because there was not clear and convincing evidence that the parties intended to create a trust. The circuit court did not explain its reasoning for invoking jurisdiction over the dispute. However, the circuit court did find that: 1) Shalom had joined AKAP as a non-PCUSA member church; 2) Shalom had not completed what the Book of Order required to form a covenant membership; and 3) the parties' course of dealing had not established a constructive trust since the evidence only showed that "the pastor attend[ed] AKAP meetings and participat[ed] in the creation of AKAP meeting" without further involvement. In explaining the circuit court's finding that AKAP failed to show that Shalom had agreed to the covenant required by the Book of Order, the court analogized PCUSA's application process to that of a "golf club." Based on this golf club membership analogy, the circuit court opined that Shalom's membership status would have been a prerequisite for it to receive assistance from PCUSA, thus making membership in PCUSA a requirement for PCUSA to extend its authority over Shalom through the Book of Order. Finally, in addressing AKAP's assertion that Shalom's "Standing Rule" proved that Shalom admitted to being a member of PCUSA and by extension, AKAP, the circuit court "d[id]n't find a lot of significance in the fact that that's what the congregation said[] as [t]he mere fact that they—that they— . . . thought that they were members doesn't translate into a membership."

After the hearing concluded, the circuit court entered a final order consistent with its ruling from the bench, granting Shalom's motion for summary judgment and denying AKAP's motion for summary judgment. This order also "declared" 1) that "Shalom . . . has sole control of its [property]"; 2) "Shalom . . . is no longer a member of AKAP and is no longer subject to AKAP's rules and regulations"; and 3) "AKAP is enjoined permanently from exercising any control over Shalom['s] . . . affairs or property." AKAP appealed.

## II. ANALYSIS

### A. *Standard of Review*

This Court must first review whether the circuit court had "subject matter jurisdiction" over the pertinent matter de novo. *Andrews v. Richmond Redev. & Hous. Auth.*, 292 Va. 79, 85 (2016). "Whether the doctrine of ecclesiastical abstention bars decision of a claim . . . presents a question of law that we [also] review de novo." *Episcopal Diocese of S. Va. v. Marshall*, 81 Va. App. 255, 265 (2024).

We also "employ the de novo standard of review when analyzing a host of issues, such as statutory interpretation, the plain meaning of contracts, [and] resolution of constitutional questions[.]" *Robert & Bertha Robinson Family, LLC v. Allen*, 295 Va. 130, 148 (2018). Similarly, we review a circuit court's grant of summary judgment de novo. *Geico Advantage Ins. Co. v. Miles*, 301 Va. 448, 455 (2022) (citing *VACORP v. Young*, 298 Va. 490 (2020)). "In doing so, we apply 'the same standard a trial court must adopt in reviewing a motion for summary judgment, accepting as true those inferences from the facts that are most favorable to the nonmoving party, unless the inferences are forced, strained, or contrary to reason.'" *Smith Dev., Inc. v. Conway*, 79 Va. App. 360, 372 (2024) (quoting *Stahl v. Stitt*, 301 Va. 1, 8 (2022)).

B. *The ecclesiastical abstention doctrine deprived the circuit court of jurisdiction to consider Shalom's complaint because Shalom specifically requested that the circuit court rule on a question explicitly involving religious doctrine.*

On appeal, AKAP contends that the circuit court erred when it determined that Shalom was not a member of AKAP because the ecclesiastical abstention doctrine applied to that portion of the parties' dispute.[13] Specifically, AKAP asserts that by deciding that Shalom "was not a member," the court "interfere[d] in the church's internal affairs" to adjudge "whether the religious entities here had adhered to their governance, internal organization, and doctrine." AKAP does acknowledge that a circuit court may consider church-property disputes if it can adjudicate the matter without addressing issues of faith and doctrine.[14] Nevertheless, AKAP argues that in this case the court effectively stepped into ecclesiastical jurisdiction to overrule the Synod's decision, abandoning its duty to apply "neutral principles" and entering the realm of "the church's governance, faith, and doctrine." Accordingly, this assignment of error involves a challenge to

---

[13] As noted by this Court previously, "[o]ur Supreme Court has not yet named the doctrine but has described its function: 'The constitutional guarantees of religious freedom . . . prohibit the civil courts from resolving ecclesiastical disputes [that] depend upon inquiry into questions of faith or doctrine.'" *Marshall*, 81 Va. App. at 268 n.7 (quoting *Jae-Woo Cha v. Korean Presbyterian Church of Wash.*, 262 Va. 604, 610 (2001)). There, we referred to this regime as "the 'ecclesiastical abstention' doctrine," consistent with other states. *Id.* (collecting authorities referring to the doctrine as the "ecclesiastical abstention doctrine"). Here, the parties refer to the doctrine as the "church autonomy" doctrine. As we wait for the Supreme Court of Virginia to bestow an official moniker for this doctrine, we will refer to it as "the 'ecclesiastical abstention' doctrine," consistent with our decision in *Marshall*. *Id*.

[14] In its answer to Shalom's complaint, AKAP summarily asserted that the complaint asked the court to rule on matters in violation of the ecclesiastical abstention doctrine. But AKAP did not expand on that position during the hearing on the competing motions for summary judgment. A trial court, however, lacks subject matter jurisdiction to decide matters that would project it into a religious thicket. *Bowie v. Murphy*, 271 Va. 126, 134 (2006) (citing *Jae-Woo Cha*, 262 Va. at 613). Thus, to the extent AKAP's argument is not preserved, it may nevertheless be raised for the first time on appeal as it challenges the trial court's subject matter jurisdiction to render the challenged ruling. *Riddick v. Commonwealth*, 72 Va. App. 132, 142 (2020).

- 14 -

the circuit court's subject matter jurisdiction that must be resolved as a "threshold" matter. *Parrish v. Fed. Nat'l Mortg. Assoc.*, 292 Va. 44, 49 (2016).

Initially, a court "always has jurisdiction to determine whether it has . . . jurisdiction." *Pure Presbyterian Church of Wash. v. Grace of God Presbyterian Church*, 296 Va. 42, 50 (2018) (quoting *Morrison v. Bestler*, 239 Va. 166, 170 (1990)). Jurisdiction is "the power to adjudicate a case upon the merits and dispose of it as justice may require." *Id.* at 49 (quoting *Shelton v. Sydnor*, 126 Va. 625, 629 (1920)). "Jurisdiction of the subject matter can only be acquired by virtue of the Constitution or of some statute." *Id.* (quoting *Humphreys v. Commonwealth*, 186 Va. 765, 772 (1947)). "[A]nd the want of such jurisdiction of the trial court [may] be noticed by this court *ex mero motu* [on its own motion]." *Id.* at 50 (alterations in original) (quoting *Humphreys*, 186 Va. at 773). Hence, "[w]ithout [subject matter] jurisdiction the court cannot proceed at all in any cause" and "a judgment on the merits made without subject matter jurisdiction is null and void." *Id.* (second alteration in original) (first quoting *Ex Parte McCardle*, 74 U.S. 506, 514 (1869); and then quoting *Morrison*, 293 Va. at 170).

"As a general rule, courts lack subject matter jurisdiction to resolve issues of church governance and disputes over religious doctrine." *Id.* at 51 (quoting *Bowie v. Murphy*, 271 Va. 126, 133 (2006)). "This prohibition arises from the religion clauses of the Constitution of the United States and the Constitution of Virginia." *Id.* As such, to determine whether they have jurisdiction, "[c]ivil courts m[ay at least] . . . conduct a limited inquiry to determine if a religious body has actually spoken[,]" for purposes of determining whether the doctrine is indeed applicable. *Vann v. Guildfield Missionary Baptist Church*, 452 F. Supp. 2d 651, 656 (W.D. Va. 2006).[15] From this authority, it follows that AKAP's assignment of error requires this Court to

---

[15] "Otherwise, religious organizations would be powerless to legally enforce their decisions when a church member disagreed, happened to be in a position to circumvent the

analyze both the United States and Virginia Constitutions, relevant historical practices, and contemporary precedent, to decide what is a novel question: whether determining the membership status of one religious entity in regards to another religious body is a constitutionally permissible subject matter for a court to resolve, even after that institution has invoked proceedings before a religious adjudicator?[16]

We begin by observing that the "constitutional guarantees of religious freedom have no deeper roots than in Virginia, where they originated, and nowhere have they been more scrupulously observed."[17] *Marshall*, 81 Va. App. at 267 (quoting *Vlaming v. W. Point Sch. Bd.*, 302 Va. 504, 528 (2023)). As a result, "[n]o State has more jealously guarded and preserved the questions of religious belief and religious worship as questions between each individual man and his Maker than Virginia." *Vlaming*, 302 Va. at 528 (quoting *Jones v. Commonwealth*, 185 Va. 335, 343 (1946)). Thus, with this precedent in mind, we start by examining how courts historically treated similar questions of jurisdiction.

---

decision, and claimed that he or she was the true representative of the church." *Vann*, 452 F. Supp. 2d at 656.

[16] Said differently, we must determine whether the circuit court had jurisdiction to enter a declaratory judgment stating that Shalom was not a member of AKAP, even after Shalom submitted to jurisdiction before the Synod to challenge AKAP's decision to remove Pastor Seo.

[17] Here, our analysis focuses on the First Amendment of the United States Constitution as AKAP does not assert that Article I, Section 16 of Virginia Constitution applies separately to this matter. Thus, our discussion in no way implicates what additional protection the Virginia Constitution may apply to the ecclesiastical abstention doctrine.

1. <u>Historical and traditional practice of courts of law addressing ecclesiastical questions</u>

The interplay between courts of law and equity and questions of religious doctrine or polity[18] have been perplexing jurists since time immemorial. 4 William Blackstone, *Commentaries* \*112-14 (noting the developing of English ecclesiastical jurisdiction).[19] Initially in England, "there was no sort of distinction between the lay and the ecclesiastical jurisdiction[,] the county-court was as much a spiritual as a temporal tribunal [and] the rights of the church were ascertained and asserted at the same time, and by the same judges, as the rights of the laity." 3 William Blackstone, *Commentaries* \*455. Ecclesiastical jurisdiction was later separated from civil jurisdiction per the adoption of Roman Catholic practice and remained separated in the wake of Henry VIII's English Reformation and the establishment of the Church

---

[18] "When used in reference to religious entities, the term 'polity' refers to the internal structural governance of the denomination." *Protestant Episcopal Church v. Truro Church*, 280 Va. 6, 12 (2010). "[A]t least three kinds of internal structure, or 'polity,' may be discerned: congregational, presbyterial, and episcopal" have been identified relating to the practice of Judeo-Christian faiths in America. Note, *Judicial Intervention in Disputes Over the Use of Church Property*, 75 Harv. L. Rev. 1142, 1143 (1962) (quoting Willard Learoyd Sperry, *Religion in America* 283-84 (1946)). "In the congregational form, each local congregation is self-governing." *Id.* "[P]resbyterial polities are representative, authority being exercised by laymen and ministers organized in an ascending succession of judicatories—presbytery over the session of the local church, synod over presbytery, and general assembly over all." *Id.* And "[i]n the episcopal form power reposes in clerical superiors, such as bishops." *Id.* We find this dichotomy to be useful for our purposes in this case as it is directly applicable to the facts but note that other structures of polity may be also pertinent to this analysis in future cases.

[19] *See also* Charles Z. Lincoln, *Civil Law and the Church* 232 (1916) (noting "[t]he origin[s] of the canon or ecclesiastical law"). The historical backdrop, however, went beyond even the canon law practices from the Roman Catholic church, which formed the earliest understanding of the interplay between law and polity within the common law. James Wayland Joyce, *Civil Power in its Relations to the Church; Considered with Special Reference to the Court of Final Ecclesiastical Appeal in England* 106-18 (1869) (describing the ancient historical development of ecclesiastical jurisdiction); Matthew Hale, *The History of the Common Law of England* 41 (John Clive ed. 1971) (1607) (noting that Roman Catholic canon law had no binding force or obligation in England after the English Reformation but had nevertheless been adopted in part by practice).

of England as the English religious authority.[20]  *See* Act of Uniformity, 1662, 14 Car. 2, ch. 4

(Eng.), *in* 1 *Sources of English Constitutional History* 543-46 (Carl Stephenson & Frederick

Marcham eds. & trans., 1937).  This split jurisdiction was conceptually justified in the notion

that civil judges did not have the power to "examin[e], judg[e], [or] pronounc[e] sentence upon

pure[ly] spiritual matter[s]" that were invested in the King's appointed clergy.  Francis Plowden,

*Principles and Law of Tithing, adapted to the Instruction and Convenience Not Only of*

*Gentlemen of the Profession of the Law, but of all Persons Interested in Tithes* 222 (1806).

Hence, in English history, "[e]cclesiastical courts were erected to take care of those things,

'which civil courts were incapable of inspecting.'"  William Warburton, *The Alliance Between*

*Church and State* 150 (Richard Hurd ed. 1737) (quoting Nathaniel Bacon, *Of Discourse* 44

(1597)).

Around the time of Virginia's Founding and that of the United States, England's

ecclesiastical courts enjoyed concurrent jurisdiction with civil courts over matters involving

crimes committed by clergy and church officials and certain civil and criminal matrimonial and

testamentary issues.[21]  *See* 2 Robert Phillimore, *Ecclesiastical Law of the Church of England*

---

[20] *See also* Edward Fischel, *The English Constitution* 276-81 (Richard J. Shee trans., 1863) (1826) (detailing that "[s]ince the Reformation[,] the appeal to Rome having been made over to the sovereign by [Henry VIII], the king became recognized as supreme judge and fountain-head of ecclesiastical jurisdiction"); James Wayland Joyce, *Sword and the Keys, Civil and Spiritual Jurisdictions: Their Union and Difference* 18-20 (1881) (providing that "the principle that spiritual questions should be restrained within the jurisdiction of the spiritual judge was distinctly expressed in the laws of that King"); Edward Coke, *Reports of Sir Edward Coke, Knt. in Thirteen Parts* 354 (J. H. Thomas ed., 2002) (1826) (noting "that by the canons ecclesiastical, none may exercise ecclesiastical jurisdiction, unless he be within the orders of the church").

[21] *See Articuli Cleri*, 9 Edw. II (Y.B. 13I5) (noting the criminal jurisdictional bounds of ecclesiastical courts); William Searle Holdsworth, *History of English Law* 619 (3d ed. 1922) (noting broad ecclesiastical jurisdiction for the correction of immoral conduct).

2306-36 (1873).[22]  But these courts had exclusive jurisdiction over matters of "spiritual [or] ecclesiastical" significance, *Caudrey's Case*, 5 Co. Rep. 1 a., 1 b. 77 Eng Rep. 1, 2 (1572), as vested in the King, largely involving church governance, resolving doctrinal and property disputes, and removing persons from membership.  *See, e.g.*, John Beames, *A Translation of Glanville* 83-98 (1812) (observing the King's control over ecclesiastical jurisdiction).  This jurisdiction included matters pertaining to membership decisions made by individual churches, known as "vestries."  2 Phillimore, *supra*, at 1871-97.  A "[v]estry," at the common law was "the assembly of the whole parish [meeting] together in some convenient place, for the dispatch of the affairs and business of the parish."  *Id.* at 1871.  And vestries were vested with rights independent of the larger Church pertaining to certain administrative matters within their walls. *See, e.g.*, *Carter v. Cropley*, 8 De G., M. & G. 680, 680-97, 44 Eng. Rep. 552, 552-59 (Ch. 1857) (holding that vestries, as the governing body of a parish, were vested under ecclesiastical law with the right to elect their minister).  At that time, though some claims involving ecclesiastical matters could be heard in civil court, once proceedings began in the ecclesiastical court, however, there was little avenue for the litigant to contest the matter elsewhere, as appeals were largely constrained by the King's discretion to remain before ecclesiastical adjudicators.[23]

---

[22] *See* John Godolphin, *Repertorium Canonicum, or, an Abridgement of the Ecclesiastical Laws of this Realm* 94-133 (1687) (listing this jurisdiction in depth); *see also Gloth v. Gloth*, 154 Va. 511, 534 (1930) (noting that English ecclesiastical jurisdiction encompassed granting divorces); *Parker's Ex'rs v. Brown's Ex'rs*, 47 Va. (6 Gratt.) 554, 582 (1850) (noting that English ecclesiastical jurisdiction encompassed probate of wills and personal estate); Comment, *The Regression of Ecclesiastical Jurisdiction*, 32 Yale L.J. 594, 594 (1923) (collecting English authorities).

[23] *See also* William Searle Holdsworth, *The Ecclesiastical Courts and Their Jurisdiction*, *in* Select Essays in Anglo-American Legal History 280-83 (1908) (noting that "[f]or lack of justice at or in any of the courts of the archbishops" a litigant was permitted to appeal to "the King's Majesty in the King's court of Chancery" pertaining to ecclesiastical matters); Robert Maugham, *Outlines of the Jurisdiction of all the Courts in England and Wales: or, Readings*

Plowden, *supra*, at 234-35 (noting the English ecclesiastical appellate structure).  Thus, drawing

from the English tradition, the early ecclesiastical abstention doctrine was derived, in part, from

the divided vesting of civil and ecclesiastical jurisdiction in English courts.

In colonial Virginia, "the Church of England was established by order of the Crown."[24]

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*,

103 Harv. L. Rev. 1409, 1423 (1990) [hereinafter *Origins*].  As no colony had an ecclesiastical

court, Virginia's General Assembly and the colony's governor were authorized to assign

jurisdiction over matters evoking an ecclesiastical concern.  *See* Erwin C. Surrency, *The Courts

in the American Colonies*, 11 Am. J. Legal Hist. 253, 275 (1967).  An early act of the General

Assembly vested the "General Court [with] power and jurisdiction to hear and determine, all

causes, matters and things whatsoever, [including] ecclesiastical or civil [matters]."  1705 Va.

Acts ch. 19; 1748 Va. Acts ch. 6.  In addressing such matters, the General Court recognized and

applied English ecclesiastical caselaw.  *See, e.g.*, *Herndon v. Carr*, Jeff. 132, 143-60 (Va. Gen.

Ct. 1772) (noting at length the implications English ecclesiastical law had on colonial probate

practice).  Yet, though jurisdiction and practice pertaining to civil court involvement in

ecclesiastical matters was clearly vested, some at that time took issue with markedly departing

from English practice.  *See Godwin v. Lunan*, Jeff. 96 (Va. Gen. Ct. 1771).

Applying its statutory authority in 1771, the General Court "adjudged that [it] possessed

ecclesiastical jurisdiction in general, and that as an ecclesiastical court they might proceed to

---

*from Blackstone and Other Text-Writers, Altered according to the Present Law* 75-88 (1838)
(noting each court in the ecclesiastical hierarchy and their jurisdiction).

[24] The prescription to the first Virginia charter, issued by James I in 1606, instructed the
Colony to "provide that the Word and Science of God be preached, planted, and used . . .
according to the rites and doctrine of the Church of England."  1 James S.M. Anderson, *The
History of The Church of England in the Colonies and Foreign Dependencies of the British
Empire* 199 (London, Rivingtons 2d ed. 1856).

censure or deprive" an Anglican minister for acting in a manner unbecoming his post. *Godwin*, Jeff. at 126 (analyzing 1748 Va. Acts ch. 6). However, it declined to do so, citing the argument of Attorney General Sir John Randolph. *See id.* In opposing the General Court's exercise of jurisdiction, Sir Randolph had argued that though the legislature provided explicit ecclesiastical jurisdiction, this was to be limited to "testamentary matters, which are of ecclesiastical cognizance in England; . . . and by no means . . . extend[ed] their cognizance to every other branch of that law." *Id.* In support of Sir Randolph, Colonel Richard Bland[25] also argued that the General Court lacked jurisdiction because the churches in Virginia "'were sui generis, of a constitution peculiar to themselves, and not resembling any before known to the law . . .' [and, as a] result of this peculiarity . . . , the right of visitation [operative jurisdiction to decide the dispute] was in the vestries." *Id.* And, though Colonel Bland's argument may not have prevailed on that day, it later found a home in post-Founding American jurisprudence.

Slowly but surely the United States and Virginia removed the preferences of establishment from the Church of England. *See* Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2194 (2003) [hereinafter *Establishment and Disestablishment*]; H.J. Eckenrode, *Separation of Church and State in Virginia: A Study in the Development of the Revolution* 130-55 (1910). In 1789, the First Amendment to the Constitution of the United States made this break from the Church of England clear, proclaiming that "Congress shall make no law

---

[25] Bland was a leading member of the House of Burgesses at the time of the case, he would eventually go on to be a Virginia delegate to the Continental Congress and was member of the 1776 Convention that adopted the first Virginia Constitution. *See Encyclopedia of Virginia Biography* 4-5 (Lyon Gardiner Tyler ed., 1915).

respecting an establishment of religion, or prohibiting the free exercise thereof."[26] *Marshall*, 81 Va. App. at 26 (quoting U.S. Const. amend. I). "Taken together, these two 'Religion Clauses protect the right of churches and other religious institutions to decide matters "of faith and doctrine" without government intrusion.'" *Id.* (quoting *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020)). But, in interpreting these provisions, the United States Supreme Court has found the Virginia development of these doctrines, predating the ratification of these Amendments, to be a compelling authority.[27] *Everson v. Bd. of Educ. of Twp. of Ewing*, 330 U.S. 1, 11-14 (1947) (recounting the Virginia debate pertaining to suspending the vestry assessment bill and the later adoption of the "Virginia Bill for Religious Liberty").

For instance, Virginia adopted the free exercise provision, co-authored by James Madison and George Mason, as a part of its 1776 Declaration of Rights and the Virginia Bill of Rights. Sanford H. Cobb, *The Rise of Religious Liberty in America: A History* 492-94 (Burt Franklin ed., 1970) (1902). Shortly thereafter, in 1779, the General Assembly declined to revive the suspended vestry assessment bill for support of the established Church, instead repealing the Church's authority to collect religious taxes. Thomas E. Buckley, *Church and State in Revolutionary Virginia, 1776-1787*, at 59-60 (1977). But, in 1784, at the request of Patrick Henry, this bill returned as "*A Bill Establishing a Provision for Teachers of the Christian*

---

[26] Although these provisions speak to actions by Congress, they eventually bound the States under the Due Process Clause of the Fourteenth Amendment. *Marshall*, 81 Va. App. at 26 (quoting U.S. Const. amend. I).

[27] In briefly recounting this history, we note the extensive recent analysis pertaining to the doctrinal expanse of the Free Exercise and Establishment Clauses contained within Article I, Section 16 of the Virginia Constitution by the majority and dissenting opinions in *Vlaming*, 302 Va. 504. The original history and tradition analysis contained within that case, however, does not delve into the question before this Court here, and we add to it discussion pertinent to how the Founders considered (or failed to consider) civil courts having to address ecclesiastical questions.

*Religion*," Charles F. James, *Documentary History of the Struggle for Religious Liberty in Virginia* 129-30 (1900), a general assessment to benefit a "multiple establishment" constituting of Christian faiths regardless of denomination. Buckley, *supra*, at 73, 117-172.

Again, however, the General Assembly let this Bill die "in committee" after considering James Madison's "great Memorial and Remonstrance." *Everson*, 330 U.S. at 11-12. In the Remonstrance, Madison had objected to the concept of multiple establishment "[b]ecause if Religion can be exempt from the authority of the Society at large, still less can it be subject to that of the Legislative Body. The latter are but the creatures and vicegerents of the former. *Their jurisdiction is both derivative and limited*." James Madison, *Memorial and Remonstrance Against Religious Assessments (June 20, 1785)*, *in* 5 The Founders' Constitution 82 (Philip B. Kurland & Ralph Lerner eds., 1987) (emphasis added). And he had further objected that:

> Because the Bill implies either that the Civil Magistrate is a competent Judge of Religious Truth; or that he may employ Religion as an engine of Civil policy. The first is an arrogant pretension falsified by the contradictory opinions of Rulers in all ages, and throughout the world: the second an unhallowed perversion of the means of salvation.

*Id.* at 83. Thus, Madison's argument emphasized the line between ecclesiastical jurisdiction and civil authority as being conceptually rooted in religious free exercise and anti-establishment concerns.[28] After this bill died, the General Assembly "enacted the famous 'Virginia Bill for

---

[28] After the United States Constitution's ratification, both Madison and Thomas Jefferson attempted to address the concerns held by religious bodies pertaining to government intrusion into their affairs by evoking ecclesiastical jurisdiction. For example, in 1804, directly after the Louisiana Purchase, an order of Ursuline Nuns in New Orleans wrote to then-President Thomas Jefferson, expressing the concern that the new owners of the territory would not be as accommodating toward religious practice as the French. Jefferson reassured the sisters:

> [T]he principles of the constitution and government of the United States are a sure guarantee to you that [your property] will be preserved to you sacred and inviolate, and that *your institution will*

Religious Liberty' originally written by Thomas Jefferson."[29]  Madison, *Memorial and Remonstrance*, *supra*, at 80.  And with that Bill's passage, the Church of England ceased to be the established faith in the Commonwealth.  *Establishment and Disestablishment*, *supra*, at 2120.

> 2.  <u>Jurisprudential and legislative treatment of cases invoking civil jurisdiction of decisions by ecclesiastical bodies.</u>

In early church property dispute cases, civil courts struggled to find a line between the ecclesiastical and the secular and returned to applying English ecclesiastical law while explicitly noting the doctrinal divorce from the established English Church.  *See Town of Pawlet v. Clark*, 13 U.S. 292, 322 (1815) (Story, J.) (applying English ecclesiastical law to resolve a church property ownership question but explicitly noting that "[b]y the revolution the state[s] . . . succeeded to all the rights of the crown" including the right to determine the validity of a church property land grant).[30]  The Supreme Court of Virginia, in answering whether "our ancestors

---

> *be permitted to govern itself according to it's* [sic] *own voluntary rules, without interference from the civil authority.*

Letter from Thomas Jefferson, President, U.S., to the Ursuline Nuns of New Orleans (July 13, 1804), *in* 44 *The Papers of Thomas Jefferson* 78, 78-79 (James P. McClure ed., 2019) (emphasis added).  Two years later, Archbishop John Carroll of Baltimore wrote to then-Secretary of State James Madison, asking for Madison's advice on personnel appointments the Catholic Church could consider for managing operations for the church in New Orleans.  Letter from John Carroll to James Madison (Nov. 17, 1806), *in* 13 *The Papers of James Madison*, *Secretary of State Series*, 70 (Tyson Reeder et al. eds., 2024).  Madison wrote back, purporting to speak for President Thomas Jefferson in declining to make a recommendation "as the case is entirely ecclesiastical," causing it to go against the "scrupulous policy of the Constitution in guarding against a political interference with religious affairs" for Madison to give his input on the matter. *Id.*  Hence, the distinction between matters civil and matters ecclesiastical in terms of *jurisdiction* was apparent to at least two of the Founders responsible for framing the Free Exercise and Establishment Clauses.  But even this authority does not clear up the jurisdictional question posed by the ecclesiastical abstention doctrine.

[29]  This bill was also known as the "Bill for Establishing Religious Freedom." *Establishment and Disestablishment*, *supra*, at 2120.  It is now codified as Code § 57-1.

[30] *See also Terrett v. Taylor*, 13 U.S. (9 Cranch) 43, 50 (1815) (Story, J.) (deciding the ownership of a Virginia Protestant Episcopal church while noting that "[t]he revolution might

- 24 -

bring with them from the mother country, . . . ecclesiastical jurisdiction?[, concluded] they did, as a part of the common law in its enlarged sense" relying on the power vested in the General Court by the legislature. *Worsham's Adm'r v. Worsham's Ex'r*, 32 Va. (5 Leigh) 589, 590 (1835) (analyzing *Godwin*, Jeff. 96). As the Revolution removed the General Court from power "it was thought proper to transfer the chancery jurisdiction of the general court to another court[] . . . and [i]ts [general] jurisdiction in ecclesiastical cases [was] either abolished, or bec[a]me obsolete." *Id.* at 592. But the court's power over secular matters that may have been brought in ecclesiastical court remained the same, though it queried "[w]hat modifications [were] consider[ed] necessary for its adaptation to existing circumstances." *Id.* at 592-23.

Drawing from this understanding, where splitting congregations fought over the right to use a church, civil courts reviewed the dispute without regard to the religious doctrinal consequences. *See Smith v. Swormstedt*, 57 U.S. (16 How.) 288, 309 (1854) (opining that "a division of [a] church organization" could be analyzed solely under the principles of contract law). Under that premise, the Supreme Court of Virginia found it had jurisdiction to decide such matters where "[t]here [wa]s no dispute between the parties about any matter of religious faith" as "the doctrines of the two parties are identical." *Brooke v. Shacklett*, 54 Va. (13 Gratt.) 301, 319-20 (1856). In making this determination, it was noted that its jurisdiction was dependent on both sides being members of the same church. *See id.* And further, "simply holding the same faith, without submitting to the government and discipline of a church, cannot make or keep a man a member of that church [and that] [t]o constitute a member of any church, two points at

---

justly take away the public patronage, the exclusive cure of souls, and the compulsive taxation for the support of the church" but that it did not permit states to divest churches of property acquired beforehand); *Trs. of Phila. Baptist Assoc. v. Hart's Ex'rs*, 17 U.S. (4 Wheat.) 1, 51 (1819) (Marshall, J.) (analyzing English ecclesiastical practices to determine whether religious organizations could hold property in charitable trusts); *Gallego's Ex'rs v. Att'y Gen.*, 30 Va. (3 Leigh) 450, 462 (1832) (same).

least are essential, . . . a profession of its faith and a submission to its government." *Id.* at 320

(quoting *Den ex dem. Day v. Bolton*, 12 N.J.L. 206, 214-15 (N.J. 1831)).

And, in 1867, drawing from this precedent, the Virginia General Assembly passed what

is now known as Code § 57-9,[31] which provided "that, in the contingency of a division of any

religious society, it should be lawful for a majority to determine to which branch such

congregation shall hereafter belong, which determination, duly reported to court, should

conclude questions as to the property held in trust for such congregation." *Finley v. Brent*, 87

Va. 103, 108 (1890) (quoting 1867 Va. Acts ch. 649-50)).

But these practices seemingly changed after the seminal case of *Watson v. Jones*, 80 U.S.

(13 Wall.) 679 (1871), where the United States Supreme Court first developed the conceptual

underpinnings for the ecclesiastical abstention doctrine, noting the jurisdictional concerns posed

to civil courts hearing ecclesiastical matters. There, two competing church elder factions

invoked civil jurisdiction to resolve their dispute over control of the "Third or Walnut Street

Presbyterian Church" in Louisville, Kentucky. *Id.* at 714. Initially attempting to resolve the

dispute, the parties proceeded before the local presbytery, who rendered judgment in favor of one

faction, before the other faction in turn appealed the matter to Synod of Kentucky, who became

divided in recognizing the true church from these factions. *See id.* at 713-14. The divided

decision was in turn appealed to the General Assembly, who also became split between the

---

[31] "Code § 57-9(A) applies to congregations of 'hierarchical churches,' that is 'churches, such as Episcopal and Presbyterian churches, that are subject to control by super-congregational bodies.'" *Truro Church*, 280 Va. at 13 (quoting *Baber v. Caldwell*, 207 Va. 694, 698 (1967)). The inquiry under Code § 57-9(A) is focused upon determining whether a "division" has occurred in the church in question. *Id.* at 21. This inquiry is often more difficult than what may be suggested textually due to the interplay of definitions provided by the church to describe when such a "division" has occurred. Henry L. Chambers, Jr. & Isaac A. McBeth, *Much Ado About Nothing Much: Protestant Episcopal Church in the Diocese of Virginia v. Truro Church*, 45 U. Rich. L. Rev. 141, 145 (2010) (noting the difficultly in determining whether such a church "division" had occurred in Truro Church in light of the definitions of "division" and "branch" in deciding whether a separated congregation falls into the "same polity" under Code § 57-9(A)).

- 26 -

factions' positions, adopting the appellees as the "true and lawful" church faction. *Id.* at 713.

The adversely affected faction then challenged the General Assembly's decision in a state circuit court, seeking a declaratory judgment that they instead were the "lawful officers of that church." *Id.* The record before the Court also noted the extensive "Presbyterian system of ecclesiastical government," whose "'judicatories' . . . entertain[ed] appeals from the decisions of [the presbytery, synod, and General Assembly], and prescribe[d] corrective measures in other cases" in regard to the procedural posture of the case. *Id.* at 727.

The United States Supreme Court found, in light of the subject matter of the suit, the extensive governing structure of the church, and the fact that the parties had originally submitted themselves to the church jurisdiction, that "the subject-matter of dispute[] [was] strictly and purely ecclesiastical in its character[]—a matter over which the civil courts exercise no jurisdiction." *Id.* at 733. The Court also held that

> in this class of cases . . . whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

*Id.* at 726-27. The Court first reasoned that English and Scottish authorities were not helpful to this inquiry since the ecclesiastical court's jurisdiction at the time was part and parcel with the established church, flying in the face of the "full and free right to entertain any religious belief" provided by the Constitution. *Id.* at 728. The Court then reasoned that a civil court wielding the judicial power to sit in jurisdiction to settle an ecclesiastical dispute would be tantamount to a church "try[ing] one of its members for murder, and punish[ing] him with death or imprisonment." *Id.* at 733. The Court opined that such a sentence would "be utterly disregarded by any civil court" because the crime of murder falls within the exclusive jurisdiction of civil authorities. *Id.* So too, the Court explained, is the exclusive jurisdiction of a church to settle

- 27 -

ecclesiastical or ministerial disputes. *Id.* at 733-34. "[I]t would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed." *Id.* at 729. And, though it did not raise any First Amendment concerns, it warned that if the civil courts were to consider these types of cases "they would have to examine [them] with minuteness and care," due to the fact that "they would become, in almost every case, the *criteria* by which the validity of the ecclesiastical decree would be determined in the civil court, . . . depriv[ing] these bodies of the right of construing their own church laws." *Id.* at 733. Thus, as enumerated in *Watson*, the ecclesiastical abstention doctrine is grounded in the separation of ecclesiastical from secular jurisdiction that vests the authority to decide ecclesiastical matters in church adjudicative bodies. *Id.* at 733-34.

The following term, the United States Supreme Court applied *Watson* to a congregational church's decision to excommunicate a majority of its trustees after a church election, by minority vote. *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131 (1872). In doing so, it held that under certain circumstances, a civil court can declare who may control the property of an independent congregational church, by evaluating whether the trustees "adhere to the organization and to the doctrines, [allowing them to] represent the church." *Id.* at 140. The Court, however noted that the question before it was "not a question of membership of the church, nor of the rights of members as such[] . . . [and] [i]t . . . conceded that [civil courts] have no power to revise or question ordinary acts of church discipline, or of excision from membership." *Id.* at 139. And it further noted that civil courts "cannot decide who ought to be members of the church, nor whether the excommunicated have been regularly or irregularly cut off" and "[w]e must take the fact of excommunication as conclusive proof that the persons exscinded are not members." *Id.* at 139-40. Thus, where membership is concerned, civil courts "may inquire whether the resolution

of expulsion was the act of the church, or of persons who were not the church and who consequently had no right to excommunicate others," but nothing more. *Id.* at 140.

Later, *Watson* and *Bouldin*'s strong jurisdictional deference to decisions made by church tribunals on ecclesiastical matters received an affirming but limiting gloss. *See Gonzalez v. Roman Cath. Archbishop of Manila*, 280 U.S. 1 (1929). In *Gonzalez*, the plaintiff challenged a decision of the Philippine Supreme Court,[32] which had dismissed his complaint contending that he had a vested right in trust to a Roman Catholic chaplaincy that had been denied by a decision of the local archbishop who had found him unqualified for the position per the Church's canon law. *See id.* at 13. The Court affirmed the lower court, holding that the plaintiff had failed to assert facts that would permit the lower court jurisdiction over the matter. *See id.* at 16. Specifically, the Court held that "[i]n the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise." *Id.* The Court reasoned that "[a]mong the church's laws which [the parties] are thus claim[ing] to be applicable are those creating tribunals for the determination of ecclesiastical controversies" and that "the appointment is a canonical act, it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them." *Id.* Thus, the Court concluded that "[u]nder like circumstances, effect is given in the courts to the determinations of the [religious] judicatory bodies." *Id.* at 16-17.

---

[32] As the eventual nation of the Philippines was an American territory at the time, the Supreme Court of the United States had statutory authority to review all final judgments and decrees of the Supreme Court of the Philippines in all actions, causes and proceedings. *De La Rama v. De La Rama*, 201 U.S. 303 (1906) (analyzing the statute in question).

Then, in 1952, *Watson* and its position on church autonomy finally became an authoritative interpretation of the First Amendment Religion Clauses.[33] *See Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 115-16 (1952). The *Kedroff* Court was faced with deciding the ownership and use of a cathedral in light of a doctrinal schism. *See id.* at 96. Ownership of the church depended upon recognizing whether the Moscow Hierarchy or the Archbishop for North America "validly selects the ruling hierarchy for the American [Russian Eastern Orthodox] churches" considering the Soviet Union's involvement with the Russian church. *Id.* at 96-97. The American faction had attempted to secede from the Russian church by "appear[ing] before the [Russian] Patriarch and the members of his Synod in Moscow, [and] present[ing] a written report on the condition of the American church, with a request for autonomy." *Id.* at 104. The Synod heard the American church's proposal and denied it, counter-offering the "reunion" of the Churches conditioned in part on "the American . . . Church to abstain 'from political activities against the U.S.S.R.' and so direct its parishes" to do

---

[33] To this point, we note that *Watson*, *Bouldin*, *Gonzalez*, and other early federal cases interpreting ecclesiastical jurisdiction of civil courts were decided at a time when the First Amendment was not considered to be applicable to the States through the Fourteenth Amendment, and before *Erie Railroad Company v. Tompkins*, 304 U.S. 64 (1938), made state law applicable in diversity cases. *See Presbyterian Church in United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 445 (1969); *see also Shepard v. Barkley*, 247 U.S. 1, 2 (1918) (affirming *Watson* but noting its limited effect on state authorities). As such, they were only a vestige of the federal common law under the preceding doctrine of *Swift v. Tyson*, 41 U.S. 1 (1842), and Virginia precedent from around that time sometimes declined to apply them or a similar analysis as they were not considered authoritative. *See, e.g.*, *Hoskinson v. Pusey*, 73 Va. (32 Gratt.) 428, 431-32 (1879) (applying *Brooke*, 54 Va. (13 Gratt.) 301, without noting *Watson* or *Bouldin*); *Episcopal Soc. v. Churchman's Reps.*, 80 Va. 718, 755 (1885) (applying *Brooke* and noting that "[i]n such cases, the court is or may be compelled to decide what is the religious faith of a particular church, and where, as is generally the case, there are differences of opinion as to what that faith is, . . . the court must and does decide" with no mention of *Watson* or *Bouldin*); *Finley*, 87 Va. at 107 (same). *But see Cheshire v. Giles*, 144 Va. 253, 260 (1926) (applying *Watson* to the then-enacted Code § 57-9); *Linn v. Carson's Adm'r*, 73 Va. (32 Gratt.) 170, 183-84 (1879) (noting that the court had jurisdiction to decide the ownership of a church "unless there is something opposed to it, either expressly or by implication, in the constitution and government of the church . . . . Upon such a question, it would seem that the law of the church must govern, its authority being unaffected by the law of the state.").

the same. *Id.* at 105. The American church declined this offer, voted to "terminate" the

recognition of the Synod, and commenced litigation to seize control of the cathedral. *Id.* After a

drawn-out legal battle, the Court of Appeals of New York agreed with the American church and

awarded the American church use of the cathedral under a New York law regulating the use of

religious property. *See id.* at 109.

Citing *Watson*, the United States Supreme Court disagreed. *See id.* at 116. Finding that

*Watson* "radiate[d]" a "power [for churches] to decide for themselves, free from state

interference, matters of church government as well as those of faith and doctrine," the Supreme

Court held that *Watson*'s application necessitated reversal of the state decision. *Id.* And, in

supporting this conclusion, the Supreme Court reasoned that, "in order that there may be free

exercise of religion," "whe[re] civil courts must draw lines between the responsibilities of church

and state for the disposition or use of property . . . [and] the property right follows as an incident

from decisions of the church custom or law on ecclesiastical issues, the church rule controls."

*Id.* at 120-21.

The *Kedroff* Court's holding remained largely undisturbed by either federal or Virginia

authorities for several years[34] and was found to apply even in cases where the parties had not

commenced proceedings before a church adjudicatory body before filing suit in civil court. *See*

*Presbyterian Church in United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*,

---

[34] *See, e.g.*, *Md. & Va. Eldership of Churches of God v. Church of God, Inc.*, 396 U.S. 367, 368 (1970) (finding that a state court had jurisdiction to hear a church property dispute that did not "involve[] . . . inquir[ing] into religious doctrine); *Baber*, 207 Va. at 695-96, 700 (applying Code § 57-9 to administer a congregational church's property dispute where there was no proceeding before a church adjudicator and the reason for the divide was not a "change of views on religious subjects" (quoting *Cheshire*, 144 Va. at 260)); *Kreshik v. St. Nicholas Cathedral of Russian Orthodox Church*, 363 U.S. 190, 191 (1960) (denying New York's attempted to circumvent *Kedroff* by amending the statutory authority underlying the Court of Appeals of New York's opinion by finding the amended statute unconstitutional for the same reasons).

393 U.S. 440, 443 (1969) (finding that Georgia's "departure-from-doctrine" test violated the First Amendment by requiring "the interpretation of particular church doctrines and the importance of those doctrines to the religion" to determine whether an implied trust had been formed where the appellee churchmen immediately challenged a PCUSA Administrative Commission's action in civil court without appealing the "decision by a to higher church tribunals—the Synod of Georgia or the [PCUSA] General Assembly"). But in that case, the Court noted for the first time that courts could use "neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded" in resolving these disputes without "resolving underlying controversies over religious doctrine."[35] *Id.* at 449.

Over five years later, the Supreme Court of Virginia adopted this approach to address a church property dispute involving a Presbyterian congregation who had voted to sever their connection to PCUSA and become an "independent and autonomous church" before filing a petition in the circuit court to transfer their church property to their church-run corporation. *Norfolk Presbytery v. Bollinger*, 214 Va. 500, 501, 504 (1974). There, the presbytery attempted to intervene in the congregation's attempt to divest the presbytery of any interest in the property, as "the congregation in undertaking unilaterally to withdraw, with its property, from the parent church was contrary to ecclesiastical law." *Id.* at 501. The presbytery asserted that it "was the

---

[35] Though similar in phrasing to the Free Exercise Clause doctrine espoused in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 879 (1990), the "neutral principle" doctrine used in the church property context considers primarily whether neutral property, trust, tort, or contract principles can decide the dispute as pleaded without resorting to questions of polity. *Jones v. Wolf*, 443 U.S. 595, 602-04 (1979). This test is unlike *Smith*, which ostensibly allows the government to foist "neutral law[s] of general applicability" on the religious and non-religious alike, so long as such laws are reasonably related to a legitimate government interest. But as this Court has noted previously, Virginia has not adopted the *Smith* doctrine and we do not belabor this observation further. *Marshall*, 81 Va. App. at 268.

first ecclesiastical court having direct jurisdiction over [the defendant]," though the defendant congregation did not initiate a proceeding before the presbytery or another PCUSA adjudicatory body. *Id.* The Supreme Court of Virginia held that in applying these "neutral principles" a civil court could resolve "dispute[s] over church property by considering the statutes of Virginia, the express language in the deeds and the provisions of the constitution of the general church" and that the presbytery had introduced sufficient evidence to confer jurisdiction upon the circuit court to evaluate its property interest. *Id.* at 505. The Court also declined to apply *Watson* as the "case rested [on] federal law" for the proposition "that those who unite themselves with a hierarchical church do so with an implied consent to its government and take title to local church property subject to an implied trust for the general church." *Id.* But the *Norfolk Presbytery* Court declined to address *Watson*'s application to matters where the parties had initiated proceedings before an ecclesiastical adjudicator prior to initiating civil litigation. *Id.*

Two years later, the United States Supreme Court solidified *Watson*'s application and tempered its previous holding in *Gonzalez* pertaining to civil court review of decisions issued by ecclesiastical adjudicators. *Serbian E. Orthodox Diocese for the United States and Canada v. Milivojevich*, 426 U.S. 696 (1976). In that case, the appellee, a defrocked bishop, challenged the decision of the church's Diocesan Council to remove him from his position in response to his opposition towards reorganization of the Diocese's boundaries and authority. *See id.* at 702. This decision had been rendered after the Church's "Holy Synod" indicted the appellee for his "acts of rebellion," resulting in the Church's "Holy Assembly unanimously finding [him] guilty of all charges and divest[ing] him of his episcopal and monastic ranks." *Id.* at 706. Instead of participating in the proceedings, the appellee instead waited for the Holy Assembly to issue judgment against him before he began "protracted litigation" in civil court to have him "declared the true Diocesan bishop" over his replacement. *Id.* at 707. The Church's ecclesiastical

judgment against the appellee was later overturned by a state appellate court on the grounds that the Church's disciplinary system was "arbitrary" in violation of *Gonzalez*, after relying on "neutral principles" to review the Church's decision. *Id.* at 706, 721.

The United States Supreme Court reversed the state court's decision, holding it to have been an "impermissible rejection of the decisions of the highest ecclesiastical tribunals of this hierarchical church upon the issues in dispute, and [an attempt to] impermissibly substitute[] its own inquiry into church polity and resolutions based thereon of those disputes." *Id.* at 708. Paring back the exception for civil judicial review provided in *Gonzalez*, the Court reasoned that civil courts could not "under the guise of 'minimal' review under the umbrella of 'arbitrariness'" in effect "judicial[ly] rewrite[e]" the Church's law without projecting the dispute "into a religious thicket" by applying purportedly "neutral principles." *Id.* at 720. Hence, absent proof of insincerity or fraud, a church's decisions "on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as *conclusive*." *Id.* at 729 (emphasis added). Thus, the Court concluded that "the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters," and "[w]hen this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them." *Id.* at 724-25. Therefore, where church adjudicatory authorities decide disputes regarding the "government . . . of subordinate bodies" civil courts cannot use "neutral principles" to review their decisions under the ecclesiastical abstention doctrine and may only conduct such a review if the litigant asserts that the adjudicator's decision was procured by fraud or collusion.

After finding the approach inapplicable in *Milivojevich*, the United States Supreme Court applied the "neutral principles of law" to resolve a property dispute between PCUSA and two factions of a congregation that was trying to leave the church. *See Jones v. Wolf*, 443 U.S. 595, 598 (1979). In response to the schism, the local presbytery appointed an Administrative Commission to investigate and resolve the dispute. *See id.* This Commission "eventually issued a written ruling declaring that the minority faction constituted 'the true congregation' of [the church] and withdr[ew] from the majority faction 'all authority to exercise office derived from the [PCUSA].'" *Id.* at 598. But this faction, having already voted to leave PCUSA, "took no part in the [C]ommission's inquiry, and did not appeal its ruling to a higher PCUS[A] tribunal." *Id.*

Applying the "neutral principles approach" the Court concluded that further proceedings were required to decide whether the Commission's decision was in error under an application of state law in interpreting the "laws and regulations of the PCUS[A]." *Id.* at 603, 608. The Court reasoned that the "neutral principles" approach was beneficial in this case, finding that its application would "free civil courts completely from entanglement[36] in questions of religious doctrine, polity, and practice." *Id.* at 603. But the Court noted that, even under this approach, if

---

[36] The "entanglement" consideration in *Jones*, 443 U.S. at 603, and the consideration of preventing of these disputes from being construed "into a religious thicket" noted in *Milivojevich*, 426 U.S. at 720, are both directly derived from the United State Supreme Court's Establishment Clause precedent in *Lemon v. Kurtzman*, 403 U.S. 602, 612-613 (1971) (noting in the *Lemon* test that "statute must not foster 'an excessive government entanglement with religion'" to pass muster under the Establishment Clause), and *Walz v. Tax Comm'n of N.Y.*, 397 U.S. 664, 674 (1970) ("We must also be sure that the end result—the effect—is not an excessive government entanglement with religion."). *Lemon* has since been seemingly abrogated and in its place, we have been "instructed that the Establishment Clause must be interpreted by 'reference to historical practices and understandings,'" which we have noted above. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)). But, as the United States Supreme Court has not opined on the effect of *Kennedy* to matters involving church property disputes, particularly, precedent that applied this *Lemon* derived doctrine, we still address these doctrines even though they probably no longer control, given this recent sea change with the Court's 2022 decision in *Kennedy*.

"the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id.* at 604.

In the wake of *Milivojevich* and *Jones*, the Supreme Court of Virginia has reached varying conclusions about the application of the ecclesiastical abstention doctrine and neutral-principle review of ecclesiastical decisions under the First Amendment. It has found that

> [t]hese principles prohibit the civil courts from resolving ecclesiastical disputes which depend upon inquiry into questions of faith or doctrine. . . . [As i]n such cases, there is a danger that the power of the state may be called upon to aid a faction espousing a particular doctrinal belief, or to "become entangled in essentially religious controversies."

*Reid v. Gholson*, 229 Va. 179, 187 (1985) (internal citation omitted) (quoting *Milivojevich*, 426 U.S. at 709). As such, the Supreme Court of Virginia has reasoned those decisions made by "a governing body or internal tribunal of an hierarchical church as an ecclesiastical determination are constitutionally immune from judicial review." [37] *Id.* at 189. And this reasoning applies to our jurisdiction to decide whether church "division[s]" are effective under Code § 57-9(A), precluding this Court from deciding such matters where the "ecclesiastical dispute" is ongoing. *Protestant Episcopal Church v. Truro Church*, 280 Va. 6, 26 (2010) ("While what is or is not an

---

[37] *E.g.*, *Bowie*, 271 Va. at 135 (holding that the circuit court had "subject matter jurisdiction over [the plaintiff church deacon's] defamation claims because the claims can be decided without addressing issues of faith and doctrine" as the statements in question did not pertain to the deacon's religious duties); *Jae-Woo Cha*, 262 Va. at 612 (holding that a circuit court correctly found it did not have subject matter jurisdiction where an elder's commission had been appointed to investigate the underlying matter, who had voted against the plaintiff pastor before he filed suit). This view has also been adopted by the U.S. Court of Appeals for the Fourth Circuit in a case involving a decision by a church to cut funding to a program utilized by a pastor, even where the pastor had not filed an internal ecclesiastical complaint. *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 333 (4th Cir. 1997) (noting that "[s]uch a decision about the nature, extent, administration, and termination of a religious ministry falls within the ecclesiastical sphere that the First Amendment protects from civil court intervention").

'ecclesiastical dispute' is often debatable, issues of religious governance are unquestionably outside the jurisdiction of the civil courts." (quoting *Reid*, 229 Va. at 187)).

Where neutral principles are concerned, the Supreme Court of Virginia has also noted that in evaluating the relationship of the parties under an ecclesiastical document, such as a church constitution or Book of Order, courts must consider the construction of the instrument in relation to the church's authority to govern as "religious freedom encompasses the 'power [of religious bodies] to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Falls Church v. Protestant Episcopal Church in the U.S.*, 285 Va. 651, 671 (2013) (quoting *Milivojevich*, 426 U.S. at 721-22). And as a result, "this Court [is] powerless to address any issues of inequity wrought thereby, as to do so would involve judicial interference with religion and clearly violate the First Amendment." *Id.* at 670-71 (holding that under the First Amendment, civil courts may not apply neutral principles to decide whether a church governing body has adopted a specific canon "unilaterally" even though it is "observed that the relationship created by a local church's decision to join a hierarchical church is analogous to a contractual relationship"). In essence, for this Court to apply "neutral principles," the parties must plead a secular dispute at heart before it—one that does not require the civil court to decide an ecclesiastical question, and one devoid of "*underlying controversies* over religious doctrine." *Pure Presbyterian*, 296 Va. at 53-54 (emphasis added) (quoting *Milivojevich*, 426 U.S. at 710) (holding in a case involving a failed merger between two churches, neither of which instituted ecclesiastical proceedings against the other, that it *was* permissible for civil courts to have jurisdiction over the matter as the Court's central inquiry was "into whether there was an agreement to merge and, if so, whether it was honored").

Here, from these authorities, ancient and contemporary, federal and state, we find that the ecclesiastical abstention doctrine stemming from the First Amendment of the United States Constitution provides for a distinct demarcation in the jurisdiction of civil courts pertaining to ecclesiastical matters, dependent on the subject matter of the request for relief. The English common law and early Virginia practice known to the Founders provide that there is a split between sectarian and secular matters and that ecclesiastical bodies are those with jurisdiction to decide cases with "spiritual [or] ecclesiastical" significance.[38] *Caudrey's Case*, 5 Co. Rep. at 1 b. 77 Eng Rep. at 2. Though our forefathers never adopted the ecclesiastical court structure present within the established Church in England, Surrency, *supra*, at 275, they considered the decisions made by the adjudicatory bodies within the *churches themselves* to generally be the jurisdictional equivalent of the jurisdiction of secular courts, *Godwin*, Jeff. at 126 (remarks of Colonel Bland), and they accorded to these bodies the same respect jurisdictionally. Madison, *Memorial and Remonstrance*, *supra*, at 82.

From these underpinnings, civil courts clearly have jurisdiction to decide church property matters through applying "neutral principles," allowing the reviewing court to "consider[] the statutes of Virginia, the express language in the deeds and the provisions of the constitution of the general church." *Norfolk Presbytery*, 214 Va. at 505. But, under the "neutral-principles" review, it is not permissible if "the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy." *Jones*, 443 U.S. at 604. And one such type of religious controversy is the review of decisions made by an ecclesiastical body regarding "matters purely ecclesiastical, . . . [which we accept] as *conclusive*." *Milivojevich*, 426 U.S. at 729; *see Pure Presbyterian*, 296 Va. at 53-54. Hence, the rule we apply here taken from these

---

[38] These same authorities also note that "vestries," what we today call congregations, also have rights related to church administration that the overarching church may not interfere with without authority. *Carter*, 8 De G., M. & G. at 680-97, 44 Eng. Rep. at 552-59.

core authorities is that where the parties have clearly first utilized an ecclesiastical authority to adjudicate all or a portion of their dispute, what is decided by those ecclesiastical bodies is binding on this Court and cannot be reviewed by a court of this Commonwealth unless the body's decision was procured by fraud or collusion. And we are permitted to use neutral principles to decide church property disputes where the dispute does not involve a doctrinal controversy or where the matter has not already been submitted to an ecclesiastical adjudicator. Now we approach the matter at bar.

3. The ecclesiastical abstention doctrine deprived the circuit court of jurisdiction to hear Shalom's complaint because the decision of the Synod is binding, under these particular facts, on the circuit court and this Court under the First Amendment.

AKAP asserts that because the PCUSA Synod previously adjudicated part of this dispute after Shalom invoked the Synod's authority to prevent AKAP from assuming control of its assets, Shalom's decision to seek a decision from the PCUSA Synod deprived the circuit court (and by extension, this Court) of jurisdiction to hear the matter. Since we find the Synod's decision deprives the circuit court of jurisdiction to hear this matter under the ecclesiastical abstention doctrine, we agree that the circuit court could not reach this matter because it lacked jurisdiction even to hear Shalom's claim as pleaded.

First, we are compelled to reach this conclusion based upon binding precedent both from the United States Supreme Court and the Supreme Court of Virginia. As previously stated *supra* by numerous authorities, where the parties have first elected to proceed before an ecclesiastical tribunal, the resulting decisions are binding on civil courts and under the First Amendment may only be reviewed in limited circumstances not present here. *See, e.g.*, *Jones*, 443 U.S. at 603; *Milivojevich*, 426 U.S. at 729; *Pure Presbyterian*, 296 Va. at 53-54; *Watson*, 80 U.S. (13 Wall.) at 733-34; *Jae-Woo Cha v. Korean Presbyterian Church of Wash.*, 262 Va. 604, 612 (2001) (applying the aforementioned principles to conclude that the circuit court lacked subject matter

- 39 -

jurisdiction to review the plaintiff's tort claims against the Korean Presbyterian Church).  Like the dispute in *Watson*, here "the subject-matter of dispute[] [was] strictly and purely ecclesiastical in its character" because it evoked a "question[] of discipline, or of faith, or ecclesiastical rule, custom, or law which had been decided by the highest of these church judicatories to which the matter has been carried[.]"  80 U.S. (13 Wall.) at 726-27, 733.  This outcome became mandatory as applied to the States after *Kedroff*, 344 U.S. at 115-16, and was reaffirmed as applying *over the neutral principles* doctrine in *Milivojevich*.  426 U.S. at 708.

Furthermore, Virginia has recognized that we are prohibited from intruding into the parties' dispute until the "ecclesiastical dispute" is resolved because the "issue[] of religious governance [is] unquestionably outside [of our] jurisdiction," even under the statutory authority provided by Code § 57-9(A).  *Truro Church*, 280 Va. at 26.  The only exception to this jurisdictional bar is a limited review of ecclesiastical decisions procured by "collusion or fraud." *Milivojevich*, 426 U.S. at 720; *Gonzalez*, 280 U.S. at 17.  Since neither Shalom nor AKAP contends that the PCUSA's Synod's decision was infected by either collusion or fraud, by granting Shalom's request for a declaratory judgment stating it was not a member, the circuit court's decision constituted an "impermissible rejection of the decisions of the highest ecclesiastical tribunals of this hierarchical church upon the issues in dispute, and [an attempt to] impermissibly substitute[] its own inquiry into church polity and resolutions based thereon of those disputes." *Milivojevich*, 426 U.S. at 708.

Lastly, we note that the posture of the litigation itself also compels the conclusion that the circuit court did not have jurisdiction over the matter.  By filing the instant complaint in the circuit court, Shalom is collaterally attacking the decision of the PCUSA's Synod, whose jurisdiction Shalom had previously submitted to before ever initiating the current civil litigation.  Moreover, when initiating its opposition to AKAP's attempt to seize control over its assets and

- 40 -

operations by an Administrative Commission, Shalom filed an ecclesiastical complaint before the Synod while asserting standing to do so *as a member* of PCUSA and, thus, per PCUSA's Book of Order, stating it was also a member of AKAP. When the Synod subsequently denied their ecclesiastical complaint, instead of appealing that decision to the PCUSA General Assembly, Shalom "terminated [its] connection" with AKAP, and filed a civil complaint in the circuit court that sought a declaration that Shalom was not a member of AKAP. And this complaint did not assert that the Synod's decision was fraught with fraud or collusion. Hence, by filing this civil complaint, Shalom effectively collaterally attacked the Synod's decision (instead of appealing it) and entirely reversed the position it took on its PCUSA membership status before the ecclesiastical tribunal. In other words, after *both parties* previously acknowledged that the ecclesiastical abstention doctrine applied barring the circuit court from deciding the matter, the circuit court nevertheless still found that Shalom was not a member of AKAP using "neutral-principles." This outcome is plainly not permitted by the United States Supreme Court decision in *Milivojevich*. 426 U.S. at 706, 721. For us to find it permissible for Shalom to undertake a litigation strategy of first filing an ecclesiastical complaint in the ecclesiastical bodies of the Presbyterian Church USA, and then, instead of appealing an adverse judgment within that forum—immediately filing a civil complaint in the Circuit Court of Fairfax County to attack the judgment of the Synod—would violate both the Establishment and Free Exercise Clauses of the United States Constitution.

As sagely noted by the *Watson* Court, "it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed." 80 U.S. (13 Wall.) at 733-34. Thus, under the First Amendment of the United States Constitution, we must find that when Shalom first filed its complaint before the PCUSA Synod, *as a PCUSA member*, the consequences of that decision

by the PCUSA Synod became binding. Therefore, since the circuit court's order granting Shalom's declaratory judgment stating that Shalom is not a PCUSA member undercuts the Synod's decision, the circuit court's decision runs afoul of the United States Supreme Court and Virginia Supreme Court's interpretations of the Establishment and Free Exercise Clauses and we must likewise conclude that the circuit court acted without jurisdiction in rendering its decision.[39]

---

[39] Our decision today, however, only finds that the circuit court did not have jurisdiction to hear Shalom's declaratory judgment claim seeking to be declared free of membership in AKAP as a direct result of Shalom's filing of the Synod complaint in which it claimed to be a member. As such, the dismissal of this case is without prejudice to Shalom's claim that there is no trust over Shalom's real property, which may be brought again under Code § 57-9(A). Shalom's PCUSA membership for the time in question is binding on Shalom due to its decision to file the Synod complaint (unless further ecclesiastical proceedings conclude otherwise), resulting in the PCUSA Book of Order being applicable to the parties, creating a putative proprietary interest in the property for AKAP for the circuit court to consider. *See, e.g.*, *Doe v. First Presbyterian Church U.S.A.*, 421 P.3d 284, 289-90 (Okla. 2017) (noting that "a church has no defense of ecclesiastical jurisdiction for a claim brought by a non-member . . . where it is undisputed, . . . that 'by admission of both parties, [a party] did not ask to become a full member and otherwise be bound further by the numerous rules of the church and its denomination'" (quoting *Guinn v. Church of Christ of Collinsville*, 775 P.2d 766, 778 (Okla. 1989))), *overruled in part on other grounds by Okla. Annual Conf. of the United Methodist Church, Inc. v. Timmons*, 538 P.3d 163, 170 (Okla. 2023). But Shalom's membership is not by itself dispositive of the overall outcome of determining the ownership of the real and other property since the deeds and trust documents in the record do not indicate that Shalom placed the property into trust for PCUSA and AKAP, as Virginia does not observe the "implied trust doctrine" nor is there a statutory provision that permits such an implication. *Norfolk Presbytery*, 214 Va. at 505; Code § 57-15.

Hence, proper jurisdiction of the circuit court is dependent on there ceasing to be an "ecclesiastical dispute" between the parties. If the circuit court does not find that the dispute can be avoided sufficiently to permit resolution of the property dispute without being drawn into considerations of religious doctrine, then the whole matter will be beyond the jurisdiction of secular courts. *Compare Pure Presbyterian*, 296 Va. at 54 (finding no such dispute), *with Truro Church*, 280 Va. at 26 (finding the requirements of Code § 57-9(A) satisfied). Upon repleading, if jurisdiction is proper, the circuit court may well be able to utilize the neutral-principles approach in addressing the property ownership interest. *Jones*, 443 U.S. at 603. Shalom might well then be able to argue that AKAP has failed to produce evidence showing that Shalom made it a beneficiary of an express trust under Virginia law and the PCUSA Book of Order—or to argue that AKAP has failed to show that the Book of Order creates an express trust at all. Conversely, AKAP would be permitted to oppose this fact by arguing that Shalom, by failing to appeal its PCUSA Synod decision to the PCUSA General Assembly, in effect created some sort of trust for itself and PCUSA under the provisions of the PCUSA Book of Order. *See, e.g.*, *Presbytery of Seattle, Inc.* v. *Rohrbaugh*, 485 P.2d 615 (Wash. 1971) (holding that where a local

III. CONCLUSION

In short, we hold that civil courts are deprived of jurisdiction to hear matters already decided by an ecclesiastical adjudicator consistent with *Milivojevich*, where the litigant files the matter first with the ecclesiastical adjudicator, averring a specific position on a doctrinal, spiritual, or other ecclesiastical matter, before attempting to challenge its decision in civil court contrary to the position it had taken previously. 426 U.S. at 706, 721. While circuit courts may utilize the "neutral-principles" approach to address church property disputes in matters where religious entities contest secular matters, civil courts cannot use "neutral principles" in a manner which permits civil courts to invade purely ecclesiastical jurisdiction. *Id.* Shalom decided to plead that it was a member of PCUSA when Shalom invoked ecclesiastical adjudication to challenge AKAP's attempt to exercise authority over Shalom's real property. In doing so, Shalom deprived the Circuit Court of Fairfax County of jurisdiction to later entertain its lawsuit in civil court on that very same issue. For this reason and all the foregoing reasons, we reverse the ruling of the circuit court and remand to the circuit court with instructions to vacate its order and dismiss Shalom's current complaint.

*Reversed and remanded.*

---

congregation did not appeal an adverse ruling by the Presbytery further in the Church's adjudicatory hierarchy that the Book of Order required a trust to be formed to the Presbytery's benefit due to the general church constitution), *cert. denied*, 405 U.S. 996 (1972), *reh. denied*, 406 U.S. 939 (1972).